# APPELLATE DIVISION

OF THE

# SUPREME COURT

OF THE

## State of New York.

---

THE PEOPLE OF THE STATE OF NEW YORK ex rel. THE TOMKINS COVE STONE COMPANY, Relator, *v.* MARTIN SAXE and Others, as the STATE TAX COMMISSION OF THE STATE OF NEW YORK, Respondents.

Third Department, December 28, 1916.

**Tax — franchise tax — when corporation not engaged in manufacturing — crushing and sorting natural product.**

A domestic corporation engaged in breaking, crushing and sorting natural rock, which it sells for use as "road metal" and for the manufacture of concrete, is not engaged in "manufacturing" within the meaning of section 183 of the Tax Law, which entitles manufacturing corporations to an exemption from a franchise tax to the extent of the capital actually employed in this State for manufacturing and in the sale of the product of manufacturing.

Such treatment of raw material created by nature and which does not itself create a new article is not manufacturing, and it makes no difference that the operation is conducted on a large scale.

CERTIORARI issued out of the Supreme Court and attested on the 11th day of March, 1916, directed to Martin Saxe and others, as the State Tax Commission of the State of New York, commanding them to certify and return to the office of the clerk of the county of Albany all and singular their proceedings had in imposing a franchise tax upon the relator.

*Warner & Korb*, attorneys [*John De Witt Warner* of counsel], for the relator.

*Egburt E. Woodbury, Attorney-General* [*James T. Cross* of counsel], for the respondents.

LYON, J.:

The relator seeks exemption from the payment of the franchise tax imposed by section 182 of the Tax Law (Consol. Laws, chap. 60; Laws of 1909, chap. 62), upon the amount of its capital stock employed in this State during the year ending October 31, 1914. The ground of relator's application for exemption is that relator is a manufacturing corporation within the contemplation of section 183 of the Tax Law, and hence entitled to exemption from taxation to the extent of the capital actually employed in this State in manufacturing and in the sale of the product of such manufacturing.

The relator is a domestic corporation organized in 1859 under the general act of 1848 authorizing the formation of corporations for manufacturing, mining, mechanical or chemical purposes; and is engaged, the relator alleges, in the manufacture of "road metal" and "concrete aggregate" at Tomkins Cove, Rockland county, N. Y. Such business consists in blasting irregular blocks of stone from the limestone cliff owned by it; of transporting them to the top of its breaker or crusher where the stone passes between three powerful sets of rollers, the first reducing the blocks of from five to twenty tons to pieces not exceeding seven inches in size; the second reducing the pieces to not exceeding four inches in size, and the third reducing the pieces to sizes of not exceeding two inches in diameter. The stones so broken are carried on conveyors or endless belts, and deposited in revolving washing cylinders fed from a storage pond upon the upland where all dirt is removed. The stone is then carried by belt conveyors to the top of the screen house where it falls over three banks of screens of various sizes of mesh, separating it into sizes of from between about two and one and one-quarter inches, one and one-quarter and three-eighths inches and below three-eighths inches. Each assorted size is then carried on belt conveyors to a separate storage bin

from which it is loaded upon cars or boats and marketed.  On its way to the storage bins the run of stone is in a general way assorted into bluish or grayish tints, which are the prevailing colors of the rock, by means of a man stationed at the side of the conveyor shifting it as the current of stone passes along, so that the lighter are run into one bin, and the darker into another.   This process of assorting adds to its marketability with landscape gardeners engaged in constructing walks and driveways in parks and private grounds, by furnishing uniform colors.   Very generally contractors engaged in concrete work wish a smaller size of crushed stone mixed with a larger, as the smaller fills the interstices between the larger making a more compact construction and requiring the use of less cement and sand.   This mixture is made by allowing the required sizes to run together upon the conveyor belt carrying the stone from the bins to the cars or boats.   To the crushed stone used upon driveways the relator has applied the term " road metal; " to stone used for concrete work the term " concrete aggregate," and to the mixture of different sizes the term " balanced and concrete aggregate."

The papers on appeal, and the extended brief of relator's counsel, contain photographs of the quarry; the breaker plant; the screening plant; the storage and classification plant and the loading plant; and also give an elaborate description of the plant of the relator, accompanied by diagrams depicting the crusher plant and screen house, showing the machinery and grouping of the crushing rolls, as well as the locations of the various screens, conveyors and apparatus.

I have gone thus fully into the evidence produced by the relator before the Tax Commission for the reason that the relator seems to rely largely upon the nature and purpose of its operations as establishing its business to be that of manufacturing, within the intent and meaning of the statute.   However, it is difficult to resist the belief that the sole business of the relator is as stated in its first report filed with the Comptroller, that simply of " crushing stone."   The result of its operations is the same as was produced in the earlier days by breaking large stones with a hammer, and throwing a few pails of water on the crushed product to wash off the dust and dirt.  Nor

would it seem that the nature of the relator's plant differs materially, excepting in the magnitude and economy of its operations, from the thousands of plants in common use on town highways and by small contractors. The latter has its small portable engine; its stone crusher; its revolving cylinder encircled by sieves of various sized mesh, to the top of which a conveyor belt carries the crushed stone as it falls from the jaws of the crusher, and revolving, separates it into various sizes. The mere fact that the large plant of the relator produces crushed stone in larger quantities and more economically would not seem to distinguish the character of the processes.

A case almost identical with the case at bar is that of *Commonwealth* v. *Dyer Quarry Company* (250 Penn. St. 589). That company was organized for the sole purpose of "quarrying, crushing, preparing or marketing stone." Its treasurer testified: "The company takes the raw material consisting of rock and stone from the quarries and carries it by hand or machinery to large crushers, which crush the stone into smaller sizes. This crushed stone is carried by belts or conductors to large screens, where it is assorted, the different sizes going into different bins, and that which is not in condition to pass through the screens goes into another bin whence it is taken back to the crusher and again re-crushed to a marketable size. The company * * * has a capacity of 4,500 tons of manufactured product per day. In its manufacturing operations it employs 18 crushers, with the necessary boilers, engines, elevators, screens, storage bins, etc., necessary for the " preparation of the stone for marketing. This is precisely the business in which the relator has been solely engaged during the last twenty years. In the case cited the court held that the quarry company was not engaged in manufacturing within the meaning of an act which allowed exemption to so much of the capital stock as was actually and exclusively employed in carrying on manufacturing within that State.

The processes through which coal passes from the time it is separated from the mass in the mine to the time it is placed upon the market is closely analogous to the processes employed by the relator in its business. It could hardly be claimed that breaking or mining coal is being engaged in manufacturing

(*People* v. *Knickerbocker Ice Co.*, 99 N.Y. 181, 183; *Byers* v. *Franklin Coal Co.*, 106 Mass. 131), even though unmixed the coal might be termed "stove metal," or the ordinary mixture of stove and chestnut coal might bear the trade mark "balanced bituminous aggregate." There are many elements of similarity between the facts in the case at bar and that of *People* v. *Knickerbocker Ice Co. (supra)*. It could not be claimed that the processes by which ice in its natural state was taken from the lake, transported, stored, and later found its way, cut into convenient cubes, upon the dinner table, constituted manufacturing ice.

In the case of *People ex rel. Union Pacific Tea Co.* v. *Roberts* (145 N.Y. 375) it was held that purchasing coffee in the raw bean, roasting and grinding it, and at times mixing it with different kinds of coffee to make a blend forming a combination article, was not manufacturing, the court saying: "The process of manufacture is supposed to produce some new article by the application of skill and labor to the raw material," and that the processes of the relator resulted in no new article as it was still coffee which was placed upon the market.

In the recent case of *People ex rel. Empire State Dairy Company* v. *Sohmer* (218 N.Y. 199) it was held that a domestic corporation engaged in the business of collecting, pastuerizing and marketing milk was not engaged in manufacturing, and hence was not exempt from the payment of a franchise tax. In the opinion in that case Judge Hiscock referred to many decisions relating to the subject. From them it is apparent that each decision must depend largely upon the facts of the particular case, and that the opinions of the courts must be construed with reference thereto.

In the case at bar no new article was produced by the relator. It simply took the raw material which had been created by the processes of nature and broke it into convenient sizes for use and sale. The reduced sizes were the raw material no less than when blasted in rock form from the cliff. The relator expended no labor in fashioning the pieces. When sold they were in precisely the chance conditions in which they left the breaker. Had the existence of the stone been due to

the agency of the relator, or an article have been created by its labor or the addition of other substances producing an article having a different character and use, a very different question would be presented. The correctness of the tax as revised is not questioned, in case the relator is not entitled to the exemption claimed.

The determination of the State Tax Commission should be affirmed, with fifty dollars costs and disbursements.

Determination unanimously confirmed, with fifty dollars costs and disbursements.