SOL LUIS DESCARTES, en su carácter de TESORERO DE PUERTO RICO, peticionario, *v.* TRIBUNAL DE CONTRIBUCIONES DE PUERTO RICO, demandado; PUERTO RICO AGGREGATES CO., interventora.

Número 281.

*Sometido:* 13 de noviembre de 1952. *Resuelto:* 18 de marzo de 1955.

*Hon. Procurador General Víctor Gutiérrez Franqui* y *José A. Mayoral, Procurador Auxiliar,* abogados del peticionario; *Mc Connell & Valdéz,* abogados de la interventora, demandante en el pleito principal.

El Juez Asociado Señor Sifre emitió la opinión del Tribunal.

Expedimos auto de *certiorari* a instancias del entonces Tesorero de Puerto Rico, hoy Secretario de Hacienda, para revisar la sentencia del extinto Tribunal de Contribuciones, declarando con lugar la demanda de la interventora, Puerto Rico Aggregates Company, en solicitud del reintegro de arbitrios pagados sobre cierta maquinaria y equipo que importó para ser utilizado en su planta.

El tribunal recurrido resolvió que la maquinaria estaba amparada por la exención que concede la sec. 16-B de la Ley de Rentas Internas, por ser "esencial en el funcionamiento y operación de la planta industrial" de la interventora, y formar parte de "la fase fabril productiva que interviene con la materia prima desde el comienzo del proceso hasta su terminación", sin que sea requisito para tener derecho a la exención el que la planta se destine a la manufactura. También decidió que de serlo, estaría igualmente exenta la maquinaria, porque a pesar de que el producto que se expende al público "no es uno química ni físicamente nuevo o distinto de la materia original", la interventora se dedica

a la manufactura, en vista de que como consecuencia del proceso fabril que lleva a cabo en su planta, "la materia prima es elaborada en un producto listo para uso comercial o industrial inmediato".

Sostiene el peticionario que de acuerdo con los preceptos de la sec. 16-B, supra, la exención contributiva sólo se concede a la maquinaria, aparatos o equipo de la fase fabril productiva de plantas industriales *manufactureras*, en las que se convierta o transforme la materia prima en un producto nuevo o distinto, y que la maquinaria a que se refiere el litigio no está amparada por la exención por ser utilizada "para la fractura, molienda, lavado y clasificación de arena y piedra", lo que no constituye proceso de manufactura dentro del significado de la ley.

■ Debemos disponer en primer término de la contención de la interventora de que procede que anulemos el auto por no haber cumplido el peticionario con la Regla 11 de nuestro Reglamento, y por ser frívolo el recurso. [1]  La petición se ajusta sustancialmente a las disposiciones de la Regla 15, que es la aplicable, y nada de trivial tiene el problema planteado por el recurrente, debidamente ante nos, a pesar de no haberse presentado en este Tribunal la transcripción de la evidencia, de lo que también se queja la interventora, ya que no hay controversia alguna en cuanto a los hechos. *Buscaglia, Tes.* v. *Tribunal de Contribuciones*, 67 D.P.R. 32.

■ De acuerdo con las conclusiones del tribunal recurrido, Puerto Rico Aggregates Company se dedica a las si-

---

[1] La Regla 15 prescribe, en parte, lo siguiente:

"(*a*) Autos de hábeas corpus, *injunctions* en auxilio de su jurisdicción apelativa, certioraris, mandamus, autos inhibitorios, quo warrants y de revisión, se expedirán solamente por orden del Tribunal, o cuando lo autorice la ley por uno de sus jueces.

"(*b*) Siempre que se invoque la jurisdicción original de este Tribunal, el peticionario deberá radicar su petición exponiendo brevemente los hechos y los fundamentos de ley en que apoya su recurso, así como un memorándum de autoridades de no más de 10 páginas para sostener su petición.

"(*c*) Cuando se radique un recurso extraordinario ante este Tribunal, la petición expondrá brevemente los hechos y los fundamentos de la ley en que basa el peticionario su recurso" . . .

guientes operaciones, y es en relación con ellas que se utiliza la maquinaria y equipo a que se refiere la controversia: "Por medio de una grúa extrae de las orillas del río material de aluvión que deposita en *trucks* y es transportado a un establecimiento. Este material de aluvión se deposita en un cajón de almacenaje de donde el material baja por su propio peso o gravedad a un alimentador mecánico que lo vierte en un transportador de correa. Este transportador conduce el aluvión o materia prima a un segregador automático también mecánico. El material es aquí segregado: el fango, la tierra y todo otro material orgánico cae en un cajón de almacenaje situado debajo del segregador. La piedra, la mayor de 3 pulgadas pasando primero por una trituradora va a un segundo transportador, terminando aquí la primera etapa del proceso. De este transportador la piedra pasa a un segundo segregador donde se separa de la arena y se lava. La arena es también lavada para extraerle la materia sucia u orgánica y es conducida mecánicamente a un cajón de almacenaje. La piedra de este segundo segregador queda separada en tamaños de 1 ½ pulgadas o menos, y pasa a otro cajón de almacenaje donde vuelve a ser lavada y de ahí finalmente almacenada. La piedra mayor de 1 ½ y menor de 2 pulgadas puede pasar a una segunda trituradora que la convierte en tamaños de 1 ½ pulgadas o menos, y cae en un tercer transportador de correa. Este transportador la conduce en dirección inversa y la deposita de nuevo en el segundo transportador que la lleva otra vez al segundo segregador para separación y lavado; y así sucesivamente hasta su almacenaje. La piedra triturada, lavada y graduada a determinados tamaños que constituye el producto terminado de la demandante se diferencia de la que se extrae de una cantera y es triturada, en que como consecuencia del procedimiento a que se somete queda desprovista de toda arena adherida o de cualquier otra materia orgánica. La arena, el otro producto terminado, queda desprovista de toda suciedad o

materia orgánica, más refinada y sufre cierto grado de purificación. De acuerdo con la opinión de peritos traídos por la demandante, ella opera una planta industrial, y en dicha planta industrial existe un proceso fabril".

Son aplicables al caso de autos las disposiciones de la sec. 16-B de la Ley de Rentas Internas, núm. 85 de 20 de agosto de 1925, pág. 585, según fué enmendada por las Leyes núm. 195 de 7 de mayo de 1949, pág. 615, y núm. 166 de 3 de mayo de 1950, pág. 449. Dicha sección fué intercalada por primera vez en la Ley de Rentas Internas, por la Ley núm. 77 de 9 de mayo de 1944, pág. 167, y entonces disponía que: "Estarán exentas del pago de los arbitrios impuestos por esta Ley toda maquinaria, aparato o equipo que sea esencial para el establecimiento y funcionamiento de *plantas industriales*. Disponiéndose, que el Tesorero de Puerto Rico dictará los reglamentos que fueren necesarios para dar cumplimiento a las disposiciones de esta sección". (Bastardillas nuestras.) En *Caparra* v. *Tribl. de Contribuciones*, 67 D.P.R. 314, fuímos llamados a interpretar esos preceptos, resolviendo que no requerían, como condición para la exención contributiva, que las plantas industriales estuvieran dedicadas a la manufactura de algún producto determinado, o sea, a la conversión o transformación de materias primas en productos terminados, mediante la aplicación, en forma directa o indirecta, de la mano de obra, y por lo tanto, que la maquinaria, aparatos o equipo esenciales para el establecimiento o funcionamiento de plantas industriales, estaban amparadas por la exención, aunque no se tratara de plantas industriales destinadas a manufacturar.

La sec. 16-B, supra, fué enmendada por primera vez, por la Ley núm. 436 de 14 de mayo de 1947, y como consecuencia de esa enmienda, quedó redactada parcialmente así: *"Estará exento del pago de los arbitrios impuestos por esta Ley todo aparato, maquinaria o equipo que sea esencial para el establecimiento o funcionamiento de plantas industriales . . . ;*

*Disponiéndose, finalmente, que por ser ésta una exención que ampara la maquinaria esencial para el establecimiento y funcionamiento de plantas industriales, deberá entenderse aplicable sólo a la maquinaria de la fase fabril productiva del proceso industrial que intervenga con las materias primas desde el comienzo del proceso de manufactura hasta su terminación . . .*" (Bastardillas nuestras.) Esas disposiciones permanecieron en dicha sección, y están en vigor en la actualidad, no obstante las leyes enmendatorias de los años 1949 y 1950. Debemos resolver si a pesar de ellas, continuó la exención siendo aplicable a la maquinaria, aparatos o equipo utilizados en plantas industriales, aunque no sean manufactureras, como decidimos en *Caparra* v. *Tribl. de Contribuciones*, supra, y como resolvió el tribunal recurrido en el caso de autos, o si por razón de tales disposiciones, quedó limitada a la maquinaria, aparatos o equipo de plantas industriales manufactureras. De llegar a esta última conclusión, será necesario decidir si la maquinaria de la interventora pertenece a la fase fabril de una industria dedicada a la manufactura dentro del alcance de la ley.

Empieza la sec. 16-B, supra, como se habrá notado, por prescribir que estará exento del pago de arbitrios todo aparato, maquinaria o equipo esencial para el establecimiento y funcionamiento de *plantas industriales*, pero después se limita la generalidad de la expresión. Aunque en la primera parte del "Disponiéndose" en que ello se hace, quedó reiterado que la exención ampara la maquinaria esencial de *plantas industriales*, subsiguientemente se dice en términos claros, que aquélla deberá entenderse aplicable sólo a la maquinaria *de la fase fabril productiva* del proceso industrial *que intervenga con las materias primas desde el comienzo de la manufactura hasta su terminación*, preceptos descriptivos a nuestro juicio, de las plantas industriales a que se refiere la ley, y que revelan la intención legislativa de conceder la exención, no a la maquinaria de una planta industrial cualquiera, y sí

de aquéllas que se dediquen a actividades manufactureras. Para llegar a una conclusión distinta tendríamos que hacer caso omiso de las palabras del estatuto, o suponer que el poder legislativo las usó inadvertidamente o con desconocimiento de su sentido. Debemos presumir todo lo contrario. Y para encontrar en la ley la intención que la motivó, estamos obligados a tomar en consideración todas sus disposiciones, si ello fuere posible, y lo es en el caso de autos. Haciéndolo así, es inespacable la conclusión de que según los preceptos que hemos subrayado de la sec. 16-B, se considera esencial y está exenta de contribución la maquinaria de la fase fabril productiva—la de producir, mediante fabricación—que intervenga con las materias primas durante todo el proceso de manufactura, en otras palabras, la maquinaria de plantas industriales dedicadas a manufacturar.

Aunque la cuestión que acabamos de decidir no estaba directamente envuelta en *Tesorero* v. *Tribl. de Contribuciones y Cervecería·India*, 71 D.P.R. 512, o en *Francis* v. *Tribl. de Contribuciones* y *Tesorero*, 74 D.P.R. 19, razón por la cual no la resolvimos, hay sin embargo, en las decisiones de esos casos manifestaciones precursoras de la interpretación que le damos aquí a las disposiciones de la sec. 16-B, supra. En el primero de ellos dijimos que: "Es evidente, pues, que el propósito legislativo fué circunscribir la exención que concedía la sección 16-B antes de la enmienda de 14 de mayo de 1947, tan sólo a la maquinaria de la fase fabril productiva del proceso industrial en sí, que tuviera necesariamente que intervenir *con la conversión* de las materias primas desde el comienzo del proceso de elaboración o manufactura hasta su terminación. Ninguna otra maquinaria que no intervenga en *la conversión* de las materias primas . . . quedó amparada por la exención . . .". En el segundo nos referimos a la decisión en *Burke* v. *Stilzerweller Destillery*, 145 S.W.2d, 861, diciendo que en él "se resuelve que bajo un estatuto *que establece una exención contributiva de maquinaria pertene-*

*ciente a corporaciones que se dedican a la manufactura o fabricación de productos*, la palabra 'manufactura' varía de acuerdo con las circunstancias y no es susceptible de una definición que sea demasiado abarcadora o exclusiva . . .''. (Bastardillas nuestras.) No hubiéramos hecho referencia a esa decisión, de haber estado bajo la creencia de que la exención no está restringida a la maquinaria de plantas manufactureras.

Hemos dado debida consideración al argumento aducido por el tribunal sentenciador al efecto de que ''la exención industrial de contribuciones contenida en la sección 16-B de la Ley de Rentas Internas respondió a la política pública de El Pueblo de Puerto Rico de crear nuevas fuentes de trabajo en adición a la agricultura, y a la ya existente industria azucarera, e intentar resolver el cada vez más agudo problema de desempleo, mediante una intensa industrialización de la Isla'', por lo cual no tendría explicación, según el criterio de dicho tribunal, el que sólo se deseara conceder exención a plantas industriales dedicadas a la manufactura y no a todas las plantas industriales, que aunque sin ser manufactureras, son también creadoras de empleos. En *Caparra* v. *Tribl. de Contribuciones*, supra, invocamos esa política pública, y lo hicimos para que nos sirviera de ayuda en el proceso de interpretar la frase ''plantas industriales'', usada al enactarse la sec. 16-B en el año 1944, sin nada que indicara si sus disposiciones se referían a plantas industriales, aunque no fueran manufactureras, o solamente a plantas destinadas a manufacturar. Ante tal incertidumbre estuvimos justificados en apoyarnos en la política pública. En el presente caso, sin embargo, la situación es completamente distinta, puesto que dicha sección, como fué modificada en el año 1947, y como lee en la actualidad, identifica con suficiente claridad las plantas cuyas maquinarias están amparadas por la exención, y manifiesta el propósito de restringirla a las que se dediquen a manufacturar. De recurrir a la política

pública para llegar a una conclusión opuesta, estaríamos haciendo caso omiso del propósito que reflejan las palabras del estatuto, y ampliando por vía de interpretación judicial la exención concedida en los términos que el poder legislativo finalmente consideró suficientes y adecuados para desarrollar la política pública de crear mayores fuentes de empleos.

■ El término "manufacturar" no es susceptible de definición precisa, como lo dijimos en *Francis* v. *Tribl. de Contribuciones y Tes.*, supra. Los precedentes judiciales discrepan en cuanto a su significado, pero es bastante obvio que la doctrina preponderante es que manufacturar implica convertir, cambiar o transformar materia original o prima en un producto nuevo o distinto. *Fruit Growers, Inc.* v. *Brogdex Co.*, 283 U. S. 1; *Hartranft* v. *Wiegman*, 121 U.S. 609; *Anheuser-Busch Brew. Asso.* v. *United States*, 207 U. S. 556; *Commonwealth* v. *Weiland Packing Co.*, 141 Atl. 148 (Pa.); *Commonwealth* v. *McGrady-Rodger Co.*, 174 Atl. 395 (Pa.); *Commonwealth* v. *Peerless Paper Specialty*, 25 A.2d, 323 (Pa.). La dificultad estriba en determinar lo que es producto nuevo o diferente, problema que ha causado las mayores dificultades a los tribunales, y que generalmente tiene que dilucidarse tomando en cuenta las circunstancias de cada situación, y la ley que le fuere aplicable.

■■ ¿Es producto nuevo o distinto el que vende al público Puerto Rico Aggregates Company como consecuencia del proceso industrial descrito en esta opinión? Manifiesta en sus conclusiones el tribunal recurrido, refiriéndose a las operaciones de la interventora y al producto que pone en el mercado, que "Era el resultado primero, de la eliminación del fango y demás elementos orgánicos inservibles que contenía dicha materia prima, y segundo, en cuanto a los elementos utilizables, de la separación de éstos en piedra y arena; la adaptación y clasificación de la piedra a tamaños deseables para uso inmediato en el comercio, y la refinación de la arena con cierta purificación". En otras palabras, lo que se ex-

pende al público es la misma materia prima, creada por acción de la naturaleza, piedra y arena, sencillamente lavada y reducida en tamaño la primera, y depurada la segunda por la eliminación de toda suciedad o materia orgánica. A la piedra y a la arena, no se le añade nada. Aquélla, terminado el proceso industrial, no sufre cambio alguno. No se le da forma ninguna o apariencia especial o característica, resultado de labor de arte o de destreza, y ni ella ni la arena, se transforman en un producto nuevo o diferente. En vista de las circunstancias que concurren en el caso de autos, debemos llegar a la conclusión de que la maquinaria a que se refiere la controversia no es de la fase fabril productiva que interviene con las materias primas en un proceso de manufactura, dentro del significado de las disposiciones de la sec. 16-B de la Ley de Rentas Internas, criterio que concuerda con el expresado por la gran mayoría de los tribunales llamados a considerar y decidir si constituyen actividades de carácter manufacturero, operaciones muy similares a las que lleva a efecto en su planta la interventora, al resolver la cuestión en forma negativa, sobre todo en casos de estatutos que conceden exención contributiva. *People* v. *Saxe*, 162 N.Y.S. 408, confirmado en 221 N.Y. 601, 117 N.E. 1081; *Commonwealth* v. *Welsh Mountain Min. & Kaolin Mfg. Co.*, 108 Atl. 722 (Pa.); *Inhabitants of Leeds* v. *Maine Crushed Rock & Gravel Co.*, 141 Atl. 73 (Me.); *Commonwealth* v. *John T. Dyer Quarry Co.*, 95 Atl. 797 (Pa.); *Iowa Limestone Co.* v. *Cook*, 233 N.W. 682 (Iowa); *Schumacher Stone Co.* v. *Tax Commission*, 18 N.E. 2d 405 (Ohio); *Wellington* v. *Inhabitants of Town of Belmont*, 41 N.E. 62 (Mass.).

Expone el tribunal recurrido que aun cuando la ley exigiera "la existencia de una planta manufacturera . . .", resultaría serlo la de la interventora, de no dársele al término "manufacturar", la interpretación restrictiva que le imparte el peticionario, y que hay decisiones en las que se define ese término como el "cambio o modificación de materias natu-

rales en artículos de valor o de uso . . .; la transformación o adaptación de materia prima en aquel cambio de forma propio para ser usada . . .". Se encuentran sin duda alguna precedentes judiciales que enuncian esa doctrina, y es enteramente cierto que el hecho de que la materia original no pierda su identidad, no es siempre factor esencial en la determinación de lo que significa manufacturar, pero no podemos darle a los preceptos pertinentes de la sec. 16-B, supra, la significación de que hay "proceso de manufactura" en todo caso en que un producto natural sea puesto en condiciones de ser utilizado, interpretación que, por lo amplia y dilatada, abarcaría cualquier acondicionamiento de la materia prima, por nimio que aquél fuere, siempre que como consecuencia de ello pudiera usarse el producto, y que no está justificada, tratándose de una legislación que, por conceder un privilegio especial, debe ser interpretada restrictivamente, sin ampliar su alcance más allá de lo que esté claramente justificado.

Manufacturar implica, como hemos dicho, cambiar, "pero no todo cambio es manufactura, y sin embargo todo cambio en un producto es el resultado de acondicionamiento, trabajo y manipulación. Pero algo más es necesario . . .". *Anheuser-Busch Brew. Asso.* v. *United States*, supra. Cambiar superficialmente un producto natural, sin marcada transformación que lo convierta en un artículo sustancialmente nuevo o diferente, que es lo que sucede con el producto de la interventora, no es manufacturar, de acuerdo con la doctrina predominante, sancionada por la mayoría de los precedentes. *Hartranft* v. *Wiegman,* supra; *Anheuser-Busch Brew. Asso.* v. *United States,* supra; *Commonwealth* v. *Snyder's Bakery,* 35 A.2d 260 (Pa.); *Inhabitants of Leeds* v. *Maine Crushed Rock & Gravel Co.,* supra.

En *Francis* v. *Tribl. de Contribuciones y Tes.,* supra, dijimos que la palabra "manufactura" debe ser definida "como indicativa del proceso mediante el cual las materias primas

*se convierten* en un artículo que finalmente quede en forma adecuada para ser usado, y como regla general, ningún artículo ha sido manufacturado hasta que haya sido puesto en condiciones para ser vendido en el mercado abierto, a los fines del uso propio del artículo". (Bastardillas nuestras.) Con esas palabras no quisimos indicar que cualquier cambio que adapte la materia prima para que pueda ser usada, es manufactura. Por el contrario, ellas demuestran que la materia original debe ser convertida, transmutada, transformada en un artículo manufacturado en forma adecuada para ser usado, y hemos expuesto ya nuestro criterio de lo que debe entenderse por producto resultante de un proceso de manufactura, dentro del sentido de la ley.

■ Sostiene la interventora que se presentó evidencia pericial en el tribunal recurrido, tendiente a demostrar que las operaciones a que se dedica eran manufactureras, y que esa prueba no fué contradicha o impugnada por la peticionaria. La definición de la palabra "manufactura" y lo que constituye manufacturar, no es una cuestión de hecho, sino de derecho, para ser decidida como tal por los tribunales. *City of Louisville* v. *Ewing Vol-Allaren Dairy Co.*, 105 S.W.2d 801, (Ky.).

En la suma reclamada en la demanda y concedida por la sentencia a la interventora, está incluída la cantidad de $3,141.66 pagada por concepto de arbitrios, sobre dos camiones importados en junio del año 1950, estando en vigor la sec. 16-B, como fué enmendada por la Ley del año 1949, que en lo que se refiere a camiones prescribe, que estarán exentos los "que se utilicen exclusiva y permanentemente en la conducción de materia prima y artículos semielaborados dentro del circuito (*premises*) de la planta industrial . . .", refiriéndose a las plantas cuyas maquinarias están exentas, las que, según hemos resuelto, deben ser plantas industriales dedicadas a la manufactura. Arguye la interventora que en lo que respecta a la suma anteriormente mencionada, no hubo

contienda en el tribunal recurrido, y que en cuanto a ella la confirmación de la sentencia "procede . . ., como cuestión rutinaria". No estamos de acuerdo. Si la maquinaria de la planta no está amparada por la exención, debido a la naturaleza o carácter de las operaciones a que se destina, tampoco lo pueden estar los camiones. Es evidente para nosotros, que nunca tuvo el peticionario la intención de allanarse a que aquéllos se considerarán exentos, cuando sostenía, como también lo sostiene en este Tribunal, que la interventora no tenía, ni tiene derecho a exención alguna, por no ser su planta una manufacturera. La cuestión que se plantea no requiere más amplia consideración.

*La sentencia deberá ser revocada, y la demanda declarada sin lugar.*