HARTMAN TOBACCO COMPANY OF PUERTO RICO, INC., Plaintiff and Petitioner, v. THE SECRETARY OF THE TREASURY, Defendant and Respondent.

No. 11852. Submitted April 3, 1959.—Decided October 20, 1959.

Córdova & González and Robert E. Schneider, Jr. for petitioner. Hiram R. Cancio, Secretary of Justice (José Trías Monge, former Secretary of Justice, on the brief) and Carlos N. Souffront, Assistant Attorney General, for respondent.

PER CURIAM.

The petitioner, Hartman Tobacco Company of Puerto Rico Inc., introduced in Puerto Rico an air-conditioning equipment and a tobacco baling machine. On January 24, 1951, the petitioner paid to the Secretary of the Treasury the corresponding taxes for the introduction of said equipment and machinery. At the same time it claimed from the Secretary of the Treasury the refund of the sum paid therefor alleging that the air-conditioning equipment and the machine for baling tobacco were exempt from payment of excises under § 16-B of the Internal Revenue Act, because

they were essential to the establishment and operation of an industrial plant. The Secretary of the Treasury denied the refund claimed and the taxpayer then resorted to the Superior Court, San Juan Part.

After a trial on the merits, said court entered the following:

## "Opinion and Judgment

"This is an action claiming the refund of excises collected and paid on machinery introduced by the plaintiff, Hartman Tobacco Company, which it alleges is exempt from taxation under the provisions of § 16-B of the Internal Revenue Act. There is no controversy as to the amount which is claimed nor as to the fact that the plaintiff suffered the burden of the tax payment. From the evidence weighed the court establishes the following:

## "Facts Proved and Findings Thereon

"(1) The plaintiff is a domestic corporation with its main office in Juncos. It imports a special kind of tobacco leaf harvested in Connecticut and shade-grown known as Connecticut Shade Tobacco. It subjects said tobacco to certain processes in its plant located in Juncos and later sells it commercially to manufacturers of the United States, of Europe, and part to local manufacturers. This product is used almost entirely as cigar wrapper.

"(2) The process to which the plaintiff subjects the tobacco received is described as follows:

"(a) It is placed in rooms having a moisture of 97 per cent in order to give sufficient moisture to the leaf to render it more flexible and manageable.

"(b) From there it is taken to a classification room where it is sorted as to color, texture and firmness of the leaf in about 20 different grades.

"(c) Each grade is taken individually to other rooms to be classified by the stems.

"(d) Then it is taken to a room where it is subjected to greater fermentation for a length of time depending on texture and type of the leaf. The heavier leaf takes longer to ferment.

"(e) It then passes to an electric press where it is reduced by compression to about one-third of its original size. Thus compressed and under adequate controlled conditions of temperature, moisture and pressure it completes its fermentation process and the product is ready for the market. In addition, and upon requirement of the purchasers, before shipment the tobacco is subjected to a fumigation process in vacuum tanks to destroy any insects on the leaves.

"(3) The machinery on which the tax herein is charged consists of an air-conditioning equipment and an electric machine to compress the tobacco. Both equipments are an essential part of the plaintiff's process. The air-conditioning equipment is used to dehumidify or dry the tobacco, and the other one to compress it.

"(4) As a result of plaintiff's activities the tobacco it receives, which is brought dry and of a brown color, is subjected to a fermentation process which is controlled by means of compression, moisture and temperature, causing the leaf to obtain a certain shade of color and texture of the type acceptable to manufacturers as cigar wrapper.

"(5) The plaintiff's finished product is the same tobacco leaf which it receives in many varieties of color, treated in such a way as to its color and texture as to become immediately acceptable in business by cigar manufacturers as wrapper.

"Conclusions of Law

"In the light of the process described in the foregoing findings of fact, the machinery introduced by the plaintiff and on which the tax in question is charged is not exempt from taxation under § 16-B of the Internal Revenue Act, as said section has been construed by this Court in *Descartes, Treas.* v. *Tax Court; P. R. Aggregates, Int.*, 78 P.R.R. 83 decided on March 18, 1955.

"Judgment

"Judgment is entered dismissing the complaint for refund of taxes.

"Let it be registered and notified."

Not satisfied with said judgment the plaintiff filed the present appeal assigning the commission of the following errors:

"1. The lower court erred in deciding that pursuant to § 16-B of the former Internal Revenue Act, as interpreted by this Court in the case of *Descartes, Treas.* v. *Tax Court; P. R. Aggregates, Int.,* the machinery involved was not exempt from taxation.

"(*a*) It erred in deciding that the process followed by the plaintiff-appellant in its plant in Juncos was not a manufacturing process.

"(*b*) It erred in weighing the evidence upon determining that the only changes in the finished tobacco were with respect to its color and texture.

"(2) The lower court erred in failing to decide that the defendant-appellee was precluded from alleging that the process followed by the plaintiff-appellant in its plant in Juncos was not a manufacturing process and that said plant was not an industrial manufacturing plant."

■■ The errors assigned were not committed. Section 16–B of the Internal Revenue Act does not exempt from tax the air-conditioning equipment and the machinery for baling tobacco introduced in Puerto Rico by the petitioner.

In accordance with the evidence presented by the petitioner it does not manufacture cigars, but rather limits itself in Puerto Rico to classify, ferment, compress, pack and fumigate the tobacco and to offer it for sale and distribution to cigar manufacturers to be used by them as wrappers. Describing the process to which the tobacco is subjected, Richard Newfield, the president of the corporation, testified as follows:

"Q. Tell me witness, what is specifically the cause of the fermentation of tobacco?

"A. The correct and proper application of heat, moisture and pressure.

"Q. Is any other product or any other matter added to that tobacco?

"A. No.

"Q. The only thing you do is moisten it, by adding moisture?

"A. Moisture is added and removed, it is returned and removed . . .

"Q. When you have finished with the tobacco and it is ready and packed, and so forth, is it the same tobacco leaf that you received cured or is it a different leaf?

"A. It is the same tobacco leaf but it is a different product. We receive it so that it can not be used by any manufacturer; when the process is completed it is ready to be used by manufacturers.

"Q. Then besides fermenting it and hastening its fermentation your work consists in packing and classifying it as to size?

"A. Yes.

(Tr. Ev., p. 68, line 22, p. 69, line 24)."

Actually the petitioner does not transform the tobacco into a new and different product, does not subject it to a manufacturing process. All it does is recondition the tobacco so that it may be used as a wrapper by cigar manufacturers. In view of these facts the trial court was justified in applying the doctrine of the case of *Descartes, Treas.* v. *Tax Court; P. R. Aggregates, Int.,* 78 P.R.R. 83.

In general terms, § 16-B of the Internal Revenue Act, as amended, provides that there shall be exempt from the payment of excises all apparatus, machinery, or equipment that may be essential for the establishment and operation of industrial plants. Said section likewise provides: "That this being an exemption which covers the essential machinery for the establishment and operation of industrial plants, it shall be construed as applicable only to the machinery of the factory stage of production of the industrial process having to do with raw materials from the beginning of the manufacturing process until completion thereof. . . ."

Interpreting said § 16-B we said in the case of *P. R. Aggregates, supra,* the following, at 91, 92 and 93:

"Is the product which the Puerto Rico Aggregates Company sells to the public a new or different article as a result of the industrial process described in this opinion? Referring to intervener's operations and to the product sold in the market, the respondent court states in its findings that 'It was the result, first, of removing the mud and other useless organic elements from the raw material; and second, as to the utilizable elements, of their separation into stone and sand; the adaptation and reduction of the stone to desirable sizes for immediate com-

mercial use, and the refining of sand to a certain degree of purification.' In other words, what is expended to the public is the same raw material created by the action of nature—stone and sand, simply washed, the former reduced in size, and the latter purified by the removal of all dirt or organic matter. Nothing is added to the stone and sand. At the end of the industrial process, the former is unchanged. It is not molded into any form or given any special appearance or characteristic by the application of art or skill, and neither the stone nor the sand is transformed into a new or different product. In view of the attendant circumstances in the case at bar, we must reach the conclusion that the machinery in question does not belong to the factory stage of production having to do with raw materials in a manufacturing process, within the meaning of the provisions of § 16-B of the Internal Revenue Act. This view is shared by a majority of the courts called upon to consider and decide whether operations very similar to those carried on by intervener in its plant are activities of a manufacturing nature, when deciding the question in the negative, particularly in cases involving tax exemption. *People* v. *Saxe*, 162 N.Y.S. 408, affirmed in 221 N.Y. 601, 117 N.E. 1081; *Commonwealth* v. *Welsh Mountain Min. & Kaolin Mfg. Co.*, 108 Atl. 722 (Pa.) ; *Inhabitants of Leeds* v. *Maine Crushed Rock & Gravel Co.*, 141 Atl. 73 (Me.) ; *Commonwealth* v. *John T. Dyer Quarry Co.*, 95 Atl. 797 (Pa.) ; *Iowa Limestone Co.* v. *Cook*, 233 N.W. 682 (Iowa) ; *Schumacher Stone Co.* v. *Tax Commission*, 18 N.E. 2d 405 (Ohio) ; *Wellington* v. *Inhabitants of Town of Belmont*, 41 N.E. 62 (Mass.).

"The respondent court contends that even if the Act should require 'the existence of a manufacturing plant . . .', the intervener's plant would be such if the term 'to manufacture' were not given the restrictive interpretation placed by petitioner, and that there are authorities defining this term as 'to modify or to change natural substances so that they become articles of value or use . . . ; the transformation or fashioning of raw materials into a change of form for use . . .' There are without doubt judicial precedents enunciating this doctrine, and it is altogether true that the fact that the original material does not lose its identity is not always an essential factor in ascertaining the meaning of manufacture. But we cannot construe the pertaining provisions of § 16-B, *supra*, in the sense that a 'process of

manufacture' is involved in every case in which a natural product is treated and made fit for use. Such interpretation, which is all-embracing and ample, would comprise any treatment of the raw material, no matter how insignificant the former may be, provided the resulting product be fit for use, and would be untenable in the case of legislation which, because it contemplates a special privilege, should be strictly construed without enhancing its scope beyond that which is clearly justified.

"To manufacture implies, as already stated, to change, 'but every change is not manufacture, and yet every change in an article is the result of treatment, labor, and manipulation. But something more is necessary . . .' *Anheuser-Busch Brew. Asso.* v. *United States, supra.* According to the prevailing doctrine, sanctioned by a majority of the precedents, the superficial change of a natural product, without marked transformation into a substantially new or different article, as is the case with intervener's product, does not amount to manufacturing. *Hartranft* v. *Wiegman, supra; Anheuser-Busch Brew. Asso.* v. *United States, supra; Commonwealth* v. *Snyder's Bakery,* 35 A. 2d 260 (Pa.) ; *Inhabitants of Leeds* v. *Maine Crushed Rock & Gravel Co., supra.*

"In *Francis* v. *Tax Court, supra,* we stated that the term 'manufacture' must be defined 'as *to work,* as raw or partly wrought materials, *into* suitable forms for use, and as a general rule no article is manufactured until it has been put in condition for sale on the open market for the purposes for which it was intended to be used.' (Italics ours.) We did not mean by those words that any change adapting the raw material to any use amounts to manufacture. On the contrary, they indicate that the original material must be converted, changed, and transformed into a manufactured article fit to be used, and we have already expressed our view as to what should be regarded as a product resulting from a manufacturing process, within the meaning of the Act.

"The intervener contends that expert testimony was offered in the respondent court tending to prove that the operations in which it is engaged are manufacturing operations, which evidence was not controverted or challenged by petitioner. The definition of the term 'manufacture' and what constitutes manufacturing is not a question of fact but of law, to be decided by the courts. *City of Louisville* v. *Ewing Vol-Allaren Dairy Co.,* 105 S. W. 2d 801 (Ky.)."

610

See also *P. Lorrilard Co.* v. *Ross,* 209 S. W. 39, cited by the Secretary of the Treasury in his brief.

In view of the foregoing the judgment on review will be affirmed.

Mr. Justice Santana Becerra did not participate herein.