DUKE POWER COMPANY, A CORPORATION v. I. L. CLAYTON, NORTH CAROLINA COMMISSIONER OF REVENUE

No. 274

(Filed 27 November 1968)

**1. Taxation § 31— sales and use taxes — mill machinery and accessories thereto**

Prior to 1 July 1961 sales of mill machinery or mill-machinery parts and accessories to manufacturing industries and plants were totally exempt from retail sales and use taxes. G.S. 105-164.13(12).

**2. Statutes § 5— statutory construction**

Words of a statute must be given their common and ordinary meaning unless another is apparent from the context, or unless they have acquired a technical significance.

**3. Taxation § 31— sales and use taxes — exemption — accessory to manufacturing machinery**

A fly-ash precipitator purchased by plaintiff power company and installed prior to 1 July 1961 for the purpose of preventing fly ash produced in the furnaces of the generating plant from polluting the air is exempt from retail sales and use taxes under G.S. 105-164.13(12) as an accessory to machinery used by plaintiff in the manufacture or generation of electricity, notwithstanding the precipitator is not used in the direct production of electricity, it being essential to the operation of the generating plant.

**4. Statutes § 5— administrative interpretations**

The Supreme Court will not follow an administrative interpretation of a statute which, in its opinion, is in conflict with the clear intent and purpose of the statute.

**5. Taxation § 31— sales and use taxes — sale of fuel to manufacturers**

After 1 July 1961 sales of fuel to manufacturers are subject to a sales or use tax of 1%. G.S. 105-164.4(1)(d); G.S. 105-164.6(1).

**6. Taxation § 31— sales and use taxes — unmanufactured products of farm and mine**

G.S. 105-164.13(3) exempts from sales and use tax products of farms, forests, and mines when sold by the producers in their original or unmanufactured state.

**7. Statutes § 5— statutory construction — reconciling two statutes**

Where two enactments are not irreconcilable, it is the duty of the Court to give effect to both.

**8. Taxation § 31— sales and use taxes — unmanufactured coal**

When fuel is the product of a mine and is sold by the producer in its original or unmanufactured state, it is exempt from sales and use taxes.

**9. Taxation § 31— definition of manufacturing**

The term manufacture as used in the sales and use tax statutes means the making of a new product from raw or partly wrought materials.

**10. Taxation § 31— sales and use taxes — unmanufactured mine products**

Coal purchased by plaintiff power company from corporations which mine the coal and then clean and crush it is exempt from sales and use taxes as a product of the mine in its original or unmanufactured state within the meaning of G.S. 105-164.13(3), neither the cleaning nor the crushing of the coal after it is mined constituting manufacturing within the meaning of the statute.

**11. Taxation § 31— sales and use taxes — unmanufactured mine products — sales by agents of the producers**

Sales of coal to plaintiff power company were made by the producers of the coal within the meaning of G.S. 105-164.13(3), notwithstanding the producers utilized sales agents in making such sales, the acts of the agents being the acts of the principals.

APPEAL by defendant from *Hasty, J.,* 27 November 1967, Schedule A, Civil Session of MECKLENBURG, certified under G.S. 7A-31(b)(1) for review by the Supreme Court without determination by the Court of Appeals.

On 31 January, 1964, Duke Power Company, Inc., (plaintiff), instituted this action under G.S. 105-267 against I. L. Clayton, Commissioner of Revenue for the State of North Carolina (defendant), to recover sales and use taxes paid under protest. These taxes were assessed upon plaintiff's purchases of coal and a fly-ash precipitator. By consent, the judge heard the case without a jury. The essential facts, which are not in dispute, are summarized as follows:

Plaintiff, a North Carolina corporation, is a public utility primarily engaged in the business of manufacturing and selling electricity. Its Allen Steam Electric Generating Plant (Allen) is located

on the Catawba River in Gaston County in a heavily populated area near the town of Belmont and about $3\frac{1}{2}$ miles from the Charlotte Municipal Airport. Allen is a coal-burning plant with a generating capacity of approximately 1,200,000 kilowatts.

Fly ash, a very fine powder, is produced when coal is burned in the boilers of a steam electric generating plant. Allen burns enormous amounts of coal and, unless the resulting fly ash is trapped, a million pounds of fly ash would be discharged daily upon the surrounding countryside. This discharge would prohibit the operation of the plant in that area and would deprive plaintiff of the best available steam-plant site in the entire Duke Power Company system. A fly-ash precipitator is a large piece of equipment which traps the fly ash and prevents its discharge into the atmosphere. It is positioned between the steam-generator boiler and the stack. Ducts from the furnace discharge combustion gases bearing the fly ash into the precipitator. Electricity can be generated without the precipitator, but, as a practical matter, the consequences of doing so could not be disregarded. No plant as large as Allen operates in the United States without similar equipment. Plaintiff ordered the precipitator in suit in 1959. It was delivered in the fall of 1960, and installation was completed in March 1961.

Fly ash is commercially marketable as a lightweight additive to concrete and asphalt mixes, cement blocks, and concrete pipe. Plaintiff first sold fly ash in 1956. By 1959 the increasing demand for it had caused plaintiff to make provision for marketing the ash. From then through August 1967, in addition to the ash used in its own construction projects, plaintiff sold 84,950.67 tons for the total price of $150,697.37. In 1960 its revenue from fly ash was $563.73; in 1966, $29,988.50. In August 1966 plaintiff contracted to sell to Nello L. Teer Construction Company Allen's total output of fly ash and gave it the first right to purchase ash from all of plaintiff's other stations. Plaintiff expects to derive approximately $90,000.00 annually from this contract.

Prior to 1 July 1961, G.S. 105-164.13(12) exempted from the retail sales and use tax "sales of mill machinery or mill machinery parts and accessories to manufacturing industries and plants." On 13 September 1963, defendant, contending that the fly-ash precipitator was not mill machinery or an accessory to mill machinery because it was not used in the "direct production" of electricity, assessed plaintiff with use tax in the amount of $4,247.85 (plus interest) on account of its purchase. Plaintiff, contending that the precipitator

came within the foregoing exemption, paid the assessment under protest on 16 September 1963.

From 1 July 1961 through 30 November 1962, at a cost of $13,-544,099.58, plaintiff purchased 3,864,879.8 tons of coal from the mines of sixty-five coal-mining companies. All but three of these companies made the sales directly to plaintiff. Each of these three sold its coal through a sales agent. Two sold through wholly owned subsidiary corporations formed for that purpose; one sold through a company which acted as sales agent for several coal-mining corporations. Two of the sales agents were reimbursed for actual expenses; one received a fixed commission, which was based on tonnage sold and bore no relation to the price of the coal. The sales companies, which never owned the coal, submitted orders to the mining corporations, collected for those which were filled, and remitted the purchase price to the producers. The coal was delivered to plaintiff on board freight cars at the mines. During the period 1 July 1961 through 30 November 1962, plaintiff paid railroad freight charges in the amount of $13,129,572.04 on the coal here involved.

On 13 September 1963 defendant assessed plaintiff with $266,-736.71 (plus interest) in sales and use taxes with reference to these coal purchases and the freight charges thereon. On 16 September 1963 plaintiff paid this sum with interest to defendant under protest. Plaintiff's contention is that the coal sales are tax free under G.S. 105-164.13(3), which exempts from the retail sales and use tax "products of farms, forests, and mines when such sales are made by the producers in their original or unmanufactured state." Defendant contends (1) that the coal is not exempt because plaintiff did not purchase it in its "original or unmanufactured state" and, in at least three instances, plaintiff did not purchase from the producer; and (2) that it is taxable both under G.S. 105-164.4(1)(d) and G.S. 105-164.6(1), which impose a sales or use tax of 1% upon the "sales of fuel to manufacturing industries and manufacturing plants for use in connection with the operation of such industries and plants other than sales of fuels to be used for residential heating purposes."

In the ground, coal is generally found in relatively horizontal layers which are interspersed with strata of sandstone, slate, limestone, or shale. These layers of impurities — called partings, slate, rash, or bone — may be as thin as a pencil point or several inches in thickness. No impurities, however, are mixed in with the coal itself. In the mining process, tunnels are systematically blasted into the seams of coal. "Everything shot down during the blasting process" (coal and impurities) is taken to the surface by the loader. There is no other way to remove coal from the ground.

Coal comes to the surface in lumps, or chunks, of varying sizes and is taken to the "tipple," a building located between the mine and the railroad cars into which the coal is loaded. There the impurities are separated from the coal either by hand-picking, washing, air cleaning, or by a mechanical vibrator. It is then called "clean coal." Thereafter it is dried (if wet) and screened or otherwise divided into lumps of various sizes (sized). The coal is usually sized in a crushing machine, which can be adjusted so that the coal may be reduced to the desired size. All the coal in suit was crushed to a size of less than two inches.

Judge Hasty found facts substantially as set out above.

With reference to the fly-ash precipitator, he concluded:

(1) The precipitator is essential to the manufacture of electricity at Allen and was "mill machinery or an accessory to mill machinery" within the meaning of G.S. 105-164.13(12). It was also mill machinery essential to plaintiff's manufacture and sale of fly ash.

(2) The precipitator, having been purchased and installed prior to 1 July 1961, was exempt from the retail sales and use tax, and plaintiff is entitled to a refund of the use tax assessed in the amount of $4,247.85 with interest from 16 September 1963.

With respect to plaintiff's purchases of coal, Judge Hasty concluded:

(1) Each of the sixty-five coal-mining companies sold plaintiff the coal in suit as a producer within the meaning of G.S. 105-164.13(3), notwithstanding that three of them utilized sales agents in making the sales.

(2) The term *manufacturing,* as used in the statute and as generally understood, does not include cleaning and crushing coal after it is mined.

(3) The coal which was purchased from 1 July 1961 through 30 November 1962 was exempt from sales and use taxes, and plaintiff is entitled to a refund of the use tax paid in the amount of $266,736.71 with interest on that sum from 16 September 1963.

From the judgment that plaintiff recover of defendant the sum of $270,984.56, with interest at the applicable statutory rate from 16 September 1963, until paid, defendant appealed.

*John D. Hicks and William I. Ward, Jr., for plaintiff appellee.*

*Thomas Wade Bruton, Attorney General; Robert L. Gunn, Assistant Attorney General, for defendant appellant.*

SHARP, J.

This appeal presents two primary questions: (1) Is the fly-ash precipitator, which plaintiff installed in 1961, mill machinery or an accessory thereto within the meaning of G.S. 105-164.13(12), and (2) Was the cleaned and crushed coal plaintiff purchased from the corporations which mined it a product of the mine in its "original or unmanufactured state" within the meaning of G.S. 105-164.13(3)? The purchases of coal from the three mining corporations which used the services of sales agents raise a third question: Were those sales made by the producers of the coal as that term is used in G.S. 105-164.13(3)? (The designated statutes are those which were applicable at the time of the installation of the fly-ash precipitator and the purchase and delivery of the coal. S. L. 1957, Ch. 1340, § 5(a), p. 1380 and p. 1379, codified in N. C. Gen. Stat., Replacement Vol. 2C (1958).)

[1]    Prior to 1 July 1961 sales of mill machinery or mill-machinery parts and accessories "to manufacturing industries and plants" were totally exempt from retail sales and use taxes. (G.S. 105-164.13(12), *supra.*) Since then they have been subject to the retail sales or use tax at the rate of 1%, with a maximum tax of $80.00 per article. G.S. 105-164.4(h). The fly-ash precipitator in suit, having been purchased, installed, and put to use prior to 1 July 1961, is exempt from sales and use tax if it is mill machinery *or* an accessory to mill machinery used by plaintiff in manufacturing. *Hosiery Mills v. Clayton, Com'r of Revenue,* 268 N.C. 673, 151 S.E. 2d 574.

Plaintiff's primary activity is the generation of electricity — a manufacturing enterprise. *City of Louisville v. Howard,* 306 Ky. 687, 208 S.W. 2d 522 (1948). It also produces and sells fly ash. Plaintiff concedes, however, that the precipitator was installed for the purpose of preventing the fly ash produced in the furnaces of its generating plant from polluting the air and surrounding area. In 1960 its sales of fly ash were minimal and incidental. However, our view of the case makes it unnecessary to decide whether the precipitator is exempt as machinery used in the manufacture of an incidental by-product.

[2, 3]    It is an elementary rule of statutory construction that words must be given their common and ordinary meaning unless another is apparent from the context, or unless they have acquired a technical significance. *Bleacheries Co. v. Johnson, Comm'r of Revenue,* 266 N.C. 692, 147 S.E. 2d 177; 7 N.C. Index 2d, Statutes § 5 (1958). Despite the fact that electricity can be generated without the precipitator, that piece of machinery is obviously essential to

the operation of a generating plant, which would have to be abandoned without it. More we need not say, for G.S. 105-164.13(12) exempted not only manufacturing machinery but also *accessories thereto. Accessory,* as defined by Webster's Third New International Dictionary (1964) is "a thing of secondary or subordinate importance; an object or device that is not essential in itself but that adds to the beauty, convenience, or effectiveness of something else." (For a discussion of the problem posed by question (1), see generally Annot., 30 A.L.R. 2d 1439 (1953) and 3 A.L.R. 2d, Later Case Service 1266 (1965).) Indubitably, the fly-ash precipitator is an accessory to machinery which plaintiff used in the manufacture or generation of electricity.

[3]    Defendant's tax assessment upon plaintiff's use of the precipitator was based upon his ruling that equipment must be "used in direct production or extractive processes" to be exempt under G.S. 105-164.13(12). For this position he attempts to apply Revenue Department's Sales and Use Tax Regulation No. 30, Section III-D.1.(a) (from which the quoted words are taken) to the sale and use of all mill machinery and to rely upon *Campbell v. Currie, Comm'r of Revenue,* 251 N.C. 329, 111 S.E. 2d 219. Regulation 30, issued 14 May 1962, was introduced in evidence by defendant without objection from plaintiff. Defendant asserts in his brief that the direct production test has been in force since 1944, when it was denominated Regulation No. 4. Citing *Campbell v. Currie, supra,* he argues that since Regulation No. 4, now Regulation No. 30, Section III-D.1.(a), has been unchanged by legislative action this Court should uphold it. No evidence in the transcript supports defendant's assertion of continuity, but — assuming the premise — Section III-D.1.(a) relates expressly to "mining"; it has no application to the fly-ash precipitator. The section provides: "(a) Sales of articles of tangible, personal property used in direct production of extractive processes inside the mine, including dynamite and other explosives, are deemed to be sales of mill machinery or mill machinery parts and accessories. . . ." The section of Regulation 30 which relates specifically to "electric power companies" is Section III-C.1.(a). It declares "all production machinery and accessories thereto" to be within the purview of G.S. 105-164.4(h).

[4]    Clearly, the fly-ash precipitator is embraced by the definition contained in Section III-C.1.(a), and Section III-D.1.(a) is totally irrelevant. In any event, the Commissioner's regulation construing the Revenue Act cannot change the meaning of a statute or control the Court's interpretation of it. "[T]his Court will not follow an ad-

ministrative interpretation which, in its opinion, is in conflict with the clear intent and purpose of the statute under consideration." *In re Vanderbilt University,* 252 N.C. 743, 747, 114 S.E. 2d 655, 658.

*Campbell v. Currie, supra,* does not support defendant's premise that the fly-ash precipitator installed in a power plant must be used in the "direct production" of electricity to come within the exemption which G.S. 104-164.13(12) afforded mill machinery, etc. In *Campbell,* the plaintiff sold lumber in 1957 to Tungsten Mining Company, which used it underground in the stoping process of its mining operations. At that time, mill machinery, etc., were exempt from the retail sales tax but were subject to a wholesale tax of 1/20th of 1%. The Commissioner, contending that lumber was not mill machinery or accessories thereto assessed the plaintiff's sales to the mine at 3%. Plaintiff paid the tax under protest and sued for its recovery. The trial judge found that the lumber "was used in the direct production and extractive process inside the mine" and its sale was "embraced within the term sales of mill machinery, mill machinery parts and accessories" as defined by the Revenue Department's Sales and use Tax Regulation No. 4. From the opinion it appears that Regulation No. 4, specifically applicable to *mining,* was practically identical with Section III-D.1.(a) of Regulation 30. Judgment was entered that plaintiff recover the amount of the tax paid. Upon appeal, defendant Commissioner contended that his Department's Regulation No. 4 went "beyond the authority granted by the legislature to the Commissioner in classifying mill machinery, mill machinery parts and accessories." In affirming the judgment of the trial judge, this Court noted that Regulation No. 4, after having been duly promulgated, had been in effect for more than fifteen years. It held that *the taxpayer* was entitled to claim the protection of Regulation 4, which, under G.S. 105-264, was "prima facie correct and a protection to the officers and taxpayers affected thereby." Obviously, under the facts of this case, defendant is in no need of "protection."

The two cases which defendant cites from other jurisdictions, *Union Carbide & Carbon Corp. v. Bowers,* 166 Ohio St. 419, 143 N.E. 2d 710 (1957) and *Tulsa Mach. Co. v. Oklahoma Tax Comm'n,* 208 Okla. 138, 253 P. 2d 1067 (1953), are likewise not pertinent to a consideration of G.S. 104-164.13(12). Respectively, they involved the construction of Ohio and Oklahoma statutes which exempted machinery only if used *directly* in the manufacturing process. Therefore, the answer to question (1) is YES. Defendant's assignments of error relating to the fly-ash precipitator are, therefore, overruled.

**[5-8]**   Between 1 July 1955 and 1 July 1961 all sales of fuel to

manufacturers were exempt from sales and use tax. S. L. 1955, Ch. 1313, § 3(e), p. 1356; S. L. 1957, Ch. 1340, § 5(a), p. 1380. Thereafter the legislature subjected sales of fuel for the operation of manufacturing plants to a sales or use tax at the rate of 1% of the sales price. G.S. 105-164.4(1)(d), G.S. 105-164.6(1). The presumption is that the General Assembly enacted these statutes with care and deliberation and with full knowledge that G.S. 105-164.13(3) — which it left in full force and effect — exempted "products of farms, forests, and mines" when sold by the producers in their original or unmanufactured state. *State v. Lance,* 244 N.C. 455, 94 S.E. 2d 335. The two enactments are not irreconcilable, and it is the duty of the Court to give effect to both. *State v. Humphries,* 210 N.C. 406, 186 S.E. 473. Therefore, when fuel is the product of a mine and sold by the producer in its original or unmanufactured state, it is exempt from sales and use taxes. Had the legislature intended otherwise, obviously it would have eliminated fuel from the exemption.

[10] The second question, therefore, is whether coal, after having been separated from the rock and slate mined with it and then crushed, remains in its "original or unmanufactured state" within the meaning of G.S. 105-164.13(3). The phrase, "original or unmanufactured state," must be construed in relation to the particular product involved and in accordance with general understanding of the words used. *See Byrd v. Aviation, Inc.,* 256 N.C. 684, 124 S.E. 2d 880; *Seminary v. Wake County,* 251 N.C. 775, 112 S.E. 2d 528. Patently, the legislature intended the term *manufacture* to explain and delimit the word *original.* A farmer who sells unshucked sweetcorn from his patch surely sells it in its original state. If the farmer shucks the roasting ears first, a technicalist might argue that they were no longer in their original state, but he would scarcely contend that the corn had been manufactured.

[9] The word *manufacture* "is not susceptible of an accurate definition that is all-embracing or all-exclusive, but is susceptible of many applications and many meanings. . . . In its generic sense, 'manufacturing' has been defined as the producing of a new article or use or ornament by the application of skill and labor to the raw materials of which it is composed." 55 C.J.S. *Manufactures,* § 1 at 667 and 670 (1948). *Accord, Bleacheries Co. v. Johnson, Comm'r of Revenue, supra* at 695-96, 147 S.E. 2d at 179; *City of Louisville v. Ewing Vol-Allmen Dairy Co.,* 268 Ky. 652, 105 S.W. 2d 801 (1937). "To make an article manufactured, the application of the labor must result in a new and different article with a distinctive name, character, or use." *Inhabitants of Leeds v. Maine Crushed Rock & Gravel*

*Co.*, 127 Me. 51, 56, 141 A. 73, 75 (1928). Thus, the usual connotation of *manufacturing* is the making of a new product from raw or partly wrought materials. Carbonize coal in a coke oven and a new and different product, coke, has been manufactured. Crush coal, however, and it is still merely coal.

In *Anheuser-Busch Brewers Ass'n v. United States*, 207 U.S. 556, 28 S. Ct. 204, 52 L. Ed. 336 (1908), plaintiff sued for a drawback on corks which it had imported from Spain and used in bottling beer for exportation. Before using the corks plaintiff put them in an air fan which removed all dust, meal, bugs, and worms. The corks were then washed, steamed, and dried. After this they were put in a glycerin-alcohol bath and dried by a special system. Plaintiff contended that this process — which took from one to three days — made them articles manufactured in the United States from imported materials and, upon exportation, entitled the manufacturer to a partial drawback of the import duties paid on the corks. In rejecting this contention, the Supreme Court, speaking through Mr. Justice McKenna, said: "Manufacture implies a change, but every change is not manufacture, and yet every change in an article is the result of treatment, labor, and manipulation. But something more is necessary. . . . There must be a transformation; a new and different article must emerge, 'having a distinctive name, character, or use.' This cannot be said of the corks in question. A cork put through the claimant's process is still a cork." *Id.* at 562, 28 S. Ct. at 206-07, 52 L. Ed. at 338. The foregoing words are equally applicable to the crushed coal.

Removing coal from underground and bringing it to the surface is mining; it does not constitute manufacturing. Annot., 17 A.L.R. 3d 7, 68-69 (1968). The first step in processing coal for sale is to separate it from the impurities which, of necessity, have been mined with it. This mechanical process, called cleaning, changes the coal no more than shucking does an ear of corn; the coal itself remains in its original or unmanufactured state — exactly as it came from the ground in chunks, or lumps, of varying sizes. Manufacturing is not involved in the first step. *Anheuser-Busch Brewers Ass'n v. United States, supra.* The second step is to reduce the size of the coal by crushing it. Is crushed coal manufactured coal?

Neither our research nor that of counsel has produced a decision whether the crushing of coal constitutes manufacturing within the meaning of taxing statutes. Cases involving the crushing and screening of quarried rock, however, are analogous. The majority of jurisdictions which have decided the question hold that quarrying and

crushing stone is not manufacturing. *Schumacher Stone Co. v. Tax Comm'n*, 134 Ohio St. 529, 18 N.E. 2d 405 (1938). The cases are collected in Annot., 17 A.L.R. 3d 7, 68-75 (1968). The following cases well state the rationale:

In *People v. Saxe*, 176 App. Div. 1, 162 N.Y.S. 408 (1916), *affirmed*, 221 N.Y. 601, 117 N.E. 1081 (1917), a case in which it was held that a corporation engaged in blasting and crushing limestone was not engaged in manufacturing, it was said: "The process through which coal passes from the time it is separated from the mass in the mine to the time it is placed upon the market is closely analogous to the process employed by the relator in its business. It could hardly be claimed that breaking or mining coal is being engaged in manufacturing." *Id.* at 410-11. A similar statement appears in *Wellington v. Inhabitants of Town of Belmont*, 164 Mass. 142, 41 N.E. 62 (1895), where Morton, J., said: "We do not see that the business of quarrying stone and breaking it up for use on roads and other similar purposes is any more a manufacturing business than mining coal and breaking it up into merchantable sizes, or farming and cutting ice." *Id.* at 143, 41 N.E. at 62.

In *Commonwealth v. John T. Dyer Quarry Co.*, 250 Pa. 589, 95 A. 797, the court said: "Quarrying is not manufacturing; neither is crushing in and of itself a manufacturing process, unless it results in the production of a new and different article." *Id.* at 591, 95 A. at 797. It reasoned: if the stone had been broken into smaller sizes by men wielding hammers it would not have been argued that this was manufacturing; the use of machinery did not change the nature of the process; the rock, "broken into sizes to meet the demands of the market," was sold just as it fell from the crusher without the application thereto of any art, skill or process which changed its appearance or form.

The Iowa Supreme Court reached the same conclusion in *Iowa Limestone Co. v. Cook*, 211 Iowa 534, 233 N.W. 682 (1930). Crushing stone, it said, "does not change the product into a new or different article, having any new or distinctive name or character. This is altogether different from the business of felling timber in its natural state, and sawing, planing, dressing, and sizing the same into an entirely new product, namely, merchantable lumber of many varieties." *Id.* at 541, 233 N.W. at 686. *Accord, Inhabitants of Leeds v. Maine Crushed Rock & Gravel Co., supra; Commonwealth v. Welsh Mountain Mining & Kaolin Mfg Co.*, 265 Pa. 380, 108 A. 722 (1919); *People v. Saxe, supra; Wellington v. Inhabitants of Town of Bel-*

*mont, supra. See also Cleveland-Cliffs Iron Co. v. Glander,* 145 Ohio St. 423, 62 N.E. 2d 94 (1945).

**[10]**     Defendant relies upon the following cases, which hold that corporations engaged in crushing rock for commercial use are engaged in manufacturing: *High Splint Coal Co. v. Campbell,* 222 Ky. 591, 1 S.W. 2d 1051 (1928) ; *Tulsa Mach. Co. v. Okla. Tax Comm'n, supra; Dolese & Shepard Co. v. O'Connell,* 257 Ill. 43, 100 N.E. 235 (1912). We have considered these cases, and they do not persuade us that crushing coal is a manufacturing process as that term is generally understood. We hold with Judge Hasty that plaintiff purchased the coal in an unmanufactured state.

Because three of the mining corporations producing the coal in suit made sales to plaintiff through sales agents, defendant contends that those sales were not made by the producer. For this position he cites *Henderson v. Gill,* 229 N.C. 313, 49 S.E. 2d 754. In that case the taxpayers were partners operating a retail florist shop, selling flowers and floral arrangements which they made. They purchased some of the flowers wholesale and grew the rest. The Commissioner assessed sales tax upon their total sales. They paid the assessment under protest and sued to recover that portion of the tax which (they asserted) had been paid upon the sale of cut flowers grown upon their own land. In denying recovery the Court said:

"In the case at bar we must keep in mind that the tax is imposed with respect to sales made by a retail merchant . . . and this should properly be the beginning of our reasoning, rather than with the exception. The sale was a transaction carried on by the plaintiffs as retail merchants through a regular place of business devoted to that purpose. . . . and not that of a farmer and cultivator of the soil in producing the product. . . ." *Id.* at 319, 49 S.E. 2d at 758.

*Henderson v. Gill* is not applicable to the facts of this case. The mining companies sold *only* the coal which they mined. It was not comingled with coal purchased from other producers; nor did they sell furnaces, stoves, grates, coal scuttles, fireside or other heating accessories. In short, they were not operating a retail coal yard and conducting mining operations as a subordinate enterprise which incidentally furnished a portion of their stock in trade. The corporate brokers which negotiated their sales to plaintiff were their agents within the most elementary definition of that term. *"Qui facit per alium facit per se.* He who acts through another acts himself — *i. e.,* the acts of an agent are the acts of the principal." *Livingston v. Investment Co.,* 219 N.C. 416, 425, 14 S.E. 2d 489, 494. The orders which plaintiff placed with the three agents were subject to accept-

ance or rejection by the mining companies, their principals. Just as the broker, who sells a tract of land for a client upon the client's terms, never owns the land he sells, these sales agents never had title to the coal which plaintiff bought. Title passed directly from the mining corporations to plaintiff when it accepted the coal F. O. B. at the mine. Obviously, the producers sold their own coal.

[11]　Judge Hasty correctly held that all the sales of coal to plaintiff were made by the producers of the coal within the meaning of G.S. 105-164.13(3), notwithstanding that three of the producers utilized sales agents in making such sales.

For the reasons stated, each of defendant's assignments of error is overruled, and the judgment of the court below is

Affirmed.