N.C. Dep't of Revenue v. Tri-State Scrap Metal, Inc., 2019 NCBC 41.

STATE OF NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18 CVS 10357

N.C. DEPARTMENT OF REVENUE,

Petitioner,

v.

TRI-STATE SCRAP METAL, INC.,

Respondent.

N.C. DEPARTMENT OF REVENUE,

Petitioner,

v.

BILTMORE IRON & METAL
COMPANY, INCORPORATED,

Respondent.

N.C. DEPARTMENT OF REVENUE,

Petitioner,

v.

TT&E IRON & METAL, INC.,

Respondent.

**ORDER AND OPINION ON
PETITION FOR JUDICIAL REVIEW**

1.　　**THIS MATTER** is before the Court on the Petition for Judicial Review filed by Petitioner North Carolina Department of Revenue ("Petitioner") on August 17, 2018.　(ECF No. 3.)　Petitioner seeks review of the Final Decision by Summary

Judgment ("Final Decision") issued by the Office of Administrative Hearings ("OAH") on July 20, 2018 pursuant to N.C.G.S. §§ 150B-43, -45, and -46. (Official Rec. on Jud. Rev. 1130–40, (ECF Nos. 14, 15) ["Bus. Ct. R."].)[1] On April 17, 2019—after the Court received the Official Record on Judicial Review ("Official Record"), (ECF Nos. 14, 15), Petitioner's Brief, (ECF No. 16), Respondents Tri-State Scrap Metal, Inc. ("Tri-State"); Biltmore Iron & Metal Company, Inc. ("Biltmore"); and TT&E Iron and Metal, Inc.'s ("TT&E") (collectively, "Respondents") Response Brief, (ECF No. 21), and Petitioner's Reply Brief, (ECF No. 22)—the Court held a hearing on the Petition for Judicial Review at which all parties were represented by counsel. For the reasons set forth below, the Court hereby **AFFIRMS** in part, **REVERSES** in part, and **REMANDS** these consolidated matters to the OAH for further proceedings.

*North Carolina Department of Justice, by Ronald D. Williams, II, for Petitioner North Carolina Department of Revenue.*

*Brooks, Pierce, McLendon, Humphrey & Leonard LLP, by Kimberly Marston and Howard L. Williams, for Respondents Tri-State Scrap Metal, Inc., Biltmore Iron & Metal Company, Inc., and TT&E Iron and Metal, Inc.*

Robinson, Judge.

---

[1] Due to its size, the Official Record on Judicial Review was filed in two parts on the Court's e-filing system. Accordingly, citations to the Official Record appear across two electronic filing numbers. (ECF Nos. 14, 15.) For reference, pages 1–600 of the Official Record appear in Part 1, (ECF No. 14), and pages 601–1171 of the Official Record appear in Part 2, (ECF No. 15).

# I. INTRODUCTION

2. This is an action for judicial review of the Final Decision on July 20, 2018 in the matters of Tri-State Scrap Metal, Inc. v. N.C. Dep't of Revenue, OAH File No. 17 REV 5627, Biltmore Iron & Metal Company, Inc. v. N.C. Dep't of Revenue, OAH File No. 17 REV 5628, and TT&E Iron and Metal, Inc. v. N.C. Dep't of Revenue, OAH File No. 17 REV 5629. The matter before the Court involves a dispute between Petitioner and Respondents regarding whether Respondents, who are secondary metal recyclers, are entitled to the lower one percent (1%) rate of privilege tax (the "Privilege Tax") on their purchases of certain machinery, parts, and accessories used in their operations at their respective facilities. Respondents purchase and collect scrap metal, consisting of both ferrous and non-ferrous metals, and use a variety of processes to transform the scrap metal into products that can be sold to its customers for use in their own manufacturing facilities.

3. In order for Respondents to convert the raw materials into products that its customers will purchase, Respondents use several pieces of equipment and accessories, which Respondents classified for tax purposes as mill machinery, parts, or accessories pursuant to N.C.G.S. § 105-187.51, thereby paying a Privilege Tax at a rate less than otherwise payable by North Carolina companies for their purchases of similar tangible personal property. Petitioner audited each Respondent's records for its equipment purchases over various time periods (the "Audit Periods") and decided, with one exception, that Respondents were not engaged in manufacturing and that, as a result, most of their purchases were not subject to the Privilege Tax.

Accordingly, Petitioner issued to each Respondent a Notice of Final Determination, which found each Respondent liable for additional State and applicable local rates of sales and use tax on its purchases.

4. On August 22, 2017, Respondents filed Petitions for Contested Case Hearings with the OAH seeking review of their respective Notices of Final Determination issued by Petitioner. After consolidating Respondents' cases, and the parties' filing of cross motions for summary judgment, the OAH issued the Final Decision denying Petitioner's motion and granting summary judgment in favor of Respondents. Petitioner now petitions this Court to reverse the Final Decision believing the OAH's Final Decision to be erroneous.

5. The issues to be decided in this action are (a) whether Respondents' operations at their respective facilities are manufacturing, and if so, (b) whether the ALJ erred in failing to engage in a purchase-by-purchase analysis when determining that Respondents' purchases are mill machinery, parts, or accessories within the meaning of N.C.G.S. § 105-187.51.

## II. FACTS AND PROCEDURAL BACKGROUND

6. The parties stipulated on the record that there is no dispute of material fact, (Bus. Ct. R. 953), and accordingly, the Court takes the facts as they are presented in the Official Record. Respondents are three secondary metal recyclers operating in North Carolina. (Bus. Ct. R. 337, 347, 357.) Tri-State, operating under the trade name Mountain Metal Recycling, is an S-corporation that operates a facility in Asheville, North Carolina. (Bus. Ct. R. 631, 636.) Biltmore is a C-corporation that

also operates a facility in Asheville, North Carolina.  (Bus. Ct. R. 624–25.)  Finally, TT&E is a C-corporation that operates a facility in Garner, North Carolina.  (Bus. Ct. R. 707.)  Petitioner North Carolina Department of Revenue is the governmental entity responsible for assessing and collecting sales and use taxes.  *See* N.C.G.S. § 105-164.2.  Petitioner examined Respondents' records, leading ultimately to the issues before this Court.

7.     As secondary metal recyclers, Respondents purchase ferrous scrap metal, nonferrous scrap metal, and electronic scrap (collectively referred to as "Scrap Metal") from various sources.  (Bus. Ct. R. 283–84.)  Scrap Metal includes everything from structural steel to aluminum cans to IT and telecom equipment.  (Bus. Ct. R. 283–84.)  The Scrap Metal is then transported to Respondents' respective facilities where, after Respondents take inventory of the materials, the Scrap Metal will undergo one or more operations, including:

> Stripping – the use of specialized machinery to strip coating and insulation from copper wire;
>
> Baling – the use of large equipment to crush and compact material into highly condensed bales in specific sizes.
>
> Torching – the use of acetylene or oxygen torches to cut metallic materials to various specifications.
>
> Shearing – the use of large stationary guillotine shears and shears mounted on mobile equipment, such as a crane or excavator, to cut and separate raw materials, typically larger items.

(Resp. Br. 4, ECF No. 21; Bus. Ct. R. 284–90, 296–302, 308–14.)

8.     Respondents all use essentially the same aforementioned processes to convert the Scrap Metal into final products capable of being sold to their customers

with one exception: TT&E uses an operation called shredding, which requires the use of a granulator (the "Granulator Shredding Operation"). The Granulator Shredding Operation uses large stationary equipment (including a granulator) to shred materials into smaller sizes and separate them into different grades of metal. (Bus. Ct. R. 357–58.)

9. Through these operations, Respondents produce finished products (such as bare brite copper, baled aluminum used beverage cans, baled wire, or #1/2 Steel Bundles, #1 Heavy Melt Steel, Prepared Plate and Structural Steel) that are then sold to manufacturers, who in turn melt or refine the products for use in their own manufacturing. (Bus. Ct. R. 284–90, 296–302, 308–14.) The products are made by Respondents to meet specifications provided by either the customer or industry standards set by the Institute of Scrap Recycling Industries Scrap Specifications Circular ("ISRI Specifications"). (Bus. Ct. R. 342–43.)

10. During the Audit Periods, Petitioner conducted examinations of each Respondent's records for purchases of equipment and accessories used in one or more of the above operations. As to Tri-State, during Petitioner's Audit Period from April 1, 2007 to March 31, 2013, Tri-State purchased, among other goods, a material handler, generator, baler, can flattener, stripper, shear logger, magnets, shears, loaders, and roll off containers, as well as other equipment, parts, supplies, equipment fluids, and fuel. (Bus. Ct. R. 632–33.) Petitioner reviewed these purchases and on October 23, 2013 issued a proposed Notice of Sales and Use Tax Assessment assessing Tri-State for tax on the purchase of these items at the general State and

applicable local rates of tax. (Bus. Ct. R. 631, 650.) Petitioner determined that none of the operations conducted by Tri-State were manufacturing and thus none of Tri-State's purchases during the Audit Period were eligible for the lower Privilege Tax. (Bus. Ct. R. 631, 636.) Tri-State objected to the proposed tax assessment and timely requested a Departmental review. (Bus. Ct. R. 631.) On June 29, 2017, after an attempt to resolve Tri-State's objections, Petitioner issued its Notice of Final Determination upholding its proposed tax assessment and assessing Tri-State for additional tax of $99,111.23, interest of $35,613.37, and penalties of $59,466.75. (Bus. Ct. R. 651.)

11. As to Biltmore, during Petitioner's Audit Period from February 1, 2009 to January 31, 2012, Biltmore purchased, among other goods, a Sennebogen material handler, a 2009 Magnum, a Volvo excavator, and a roll off container, as well as other equipment, parts, supplies, equipment fluids, and fuel. (Bus. Ct. R. 597.) Petitioner reviewed these purchases and decided that none of the operations conducted by Biltmore qualified as manufacturing. (Bus. Ct. R. 601.) Accordingly, Petitioner issued a proposed Notice of Sales and Use Tax Assessment on February 20, 2013 assessing Biltmore tax on the purchase of these items at the general State and applicable local rates of tax. (Bus. Ct. R. 597, 620.) Biltmore objected to the proposed tax assessment and timely requested a Departmental review. (Bus. Ct. R. 597.) Thereafter, unable to resolve Biltmore's objections to the tax assessments, Petitioner issued a Notice of Final Determination upholding the original tax assessment and

assessing Biltmore for additional tax of $61,870.41, interest of $20,960.46, and penalties of $16,967.60.  (Bus. Ct. R. 624.)

12.     As to TT&E, during Petitioner's Audit Period from August 1, 2009 to July 31, 2012, TT&E purchased, among other goods, a granulator, cranes, shears, torches, heavy duty containers, repair parts for equipment, operating supplies, computer equipment, as well as other equipment, parts, supplies, equipment fluids, and fuel.  (Bus. Ct. R. 632.)  Petitioner reviewed these purchases, determined that TT&E's operations did not qualify as manufacturing, and issued a proposed Notice of Sales and Use Tax Assessment assessing TT&E tax on these purchases.  (Bus. Ct. R. 632–33, 706.)  TT&E objected to the proposed tax assessment and timely requested a Departmental review.  (Bus. Ct. R. 633.)  During the Departmental review, Petitioner changed its prior position, and concluded that the Granulator Shredding Operation was in fact properly considered "manufacturing."  Accordingly, TT&E's purchase of the granulator was subject to the Privilege Tax.  (Bus. Ct. R. 633.)  Otherwise, Petitioner did not determine that TT&E's other operations qualified as manufacturing.  (Bus. Ct. R. 633, 710.)  On June 29, 2017, Petitioner issued a Notice of Final Determination adjusting the proposed tax assessment to reflect its determination, assessing TT&E for additional tax of $99,720.81, interest of 31,701.15, and penalties of $24,930.21.  (Bus. Ct. R. 707.)

13.     On August 22, 2017, Respondents filed Petitions for Contested Case Hearings with the OAH seeking review of their respective Notices of Final Determination.  On November 29, 2017, the OAH issued an Order of Consolidation,

which consolidated the matters for hearing pursuant to N.C.G.S. § 150B-26. On April 13, 2018, the parties filed cross motions for summary judgment, which were heard on April 25, 2018 before the Honorable Melissa Owens Lassiter, Administrative Law Judge ("ALJ"). On July 20, 2018, the OAH issued the Final Decision. ALJ Lassiter concluded that Respondents proved by a preponderance of the evidence that their recycling businesses involved manufacturing, and that, therefore, Petitioner acted erroneously when determining that Respondents were not entitled to remit the Privilege Tax. (Bus. Ct. R. 1137–38.) Accordingly, the OAH granted Respondents' motions for summary judgment, denied Petitioner's motion for summary judgment, and reversed Petitioner's Notices of Final Determination. (Bus. Ct. R. 1130.)

14. On August 17, 2018, Petitioner submitted its Petition for Judicial Review, which is now before this Court. (ECF No. 3.) The parties thereafter filed the Official Record on November 1, 2018 pursuant to Business Court Rule 13.3. (ECF Nos. 14, 15.) On December 3, 2018, Petitioner filed a brief in support of its Petition for Judicial Review. (ECF No. 16.) Respondents filed their consolidated response brief on February 1, 2019. (ECF No. 21.) Petitioner filed a reply brief on February 14, 2019. (ECF No. 22.)

15. The Petition for Judicial Review came before the Court for oral argument on April 17, 2019, at which all parties were represented by counsel, and is now ripe for determination.

## III.   ANALYSIS

A. Standard of Review

16.   The task before this Court is to "determine whether the petitioner is entitled to the relief sought in the petition based upon [a] review of the final decision and the official record." N.C.G.S. § 150B-51(c).  The appeal of a final decision of the OAH in a contested case "arising from [a] summary judgment order[ ] [is] decided using a *de novo* standard of review." *Midrex Techs. v. N.C. Dep't of Revenue*, 369 N.C. 250, 257, 794 S.E.2d 785, 791 (2016).  Accordingly, the Court will "make a *de novo* determination of whether [the ALJ] correctly granted summary judgment in favor of the [Respondents] and against [Petitioner]." *Id.*  "Under the *de novo* standard of review, the [Court] consider[s] the matter anew and freely substitut[es] its own judgment for [that of the lower court]." *Id.* (alterations in original) (citations and quotation marks omitted).  Summary judgment is appropriate where there is no factual dispute and only questions of law remain. *Wal-Mart Stores E. v. Hinton*, 197 N.C. App. 30, 37, 676 S.E.2d 634, 638 (2009).

17.   "In reviewing a final decision allowing . . . summary judgment, . . . [i]f the order of the court does not fully adjudicate the case, the court shall remand the case to the [ALJ] for such further proceedings as are just." N.C.G.S. § 150B-51(d).

18.   The facts of this case are not in dispute.  Instead, Petitioner contends that the ALJ erred (1) in concluding that Respondents' operations are manufacturing as applied to the undisputed facts of this case, and (2) by failing to engage in a purchase-by-purchase analysis to determine if Respondents' purchases during the

respective Audit Periods were mill machinery, parts, or accessories used during the manufacturing process entitled to the Privilege Tax. Accordingly, the questions before this Court involve statutory interpretation and are therefore questions of law. *Parkdale Am., LLC v. Hinton*, 200 N.C. App. 275, 278, 684 S.E.2d 458, 461 (2009). Petitioner contends that the ALJ's decision is contrary to North Carolina case law and Petitioner's own published interpretations of tax statutes, and consequently, if the proper interpretation of N.C.G.S. § 105-187.51 is applied to the undisputed facts, Respondents are not entitled to the Privilege Tax on the items purchased during the respective Audit Periods.

B. <u>At Least Some of Respondents' Operations are Properly Considered Manufacturing</u>

19. The Court first addresses whether Respondents are manufacturers eligible for the Privilege Tax. Section 105-187.51, effective during the Audit Periods and therefore the statute that controls the Court's decision in this matter, provides that a privilege tax of one percent (1%) is imposed on "[a] manufacturing industry or plant that purchases mill machinery or mill machinery parts or accessories for storage, use, or consumption[.]" N.C.G.S. § 105-187.51. The Privilege Tax is a partial exemption from State and local sales and use tax on tangible personal property. *Id.* The taxpayer bears the burden of showing, by a preponderance of the evidence, that it is eligible for the lower rate of taxation and entitled to remit the 1% Privilege Tax rather than the general State and local rates of tax. *See Piedmont Canteen Serv., Inc. v. Johnson*, 256 N.C. 155, 163, 123 S.E.2d 582, 587 (1962).

20.     Accordingly, in order for Respondents' purchases to be considered "mill machinery or mill machinery parts or accessories" subject to the Privilege Tax, the Court must first determine whether Respondents are engaged in manufacturing. The undisputed material facts in this case reveal that at least some of the processes and operations used at Respondents' respective facilities support a finding that Respondents are manufacturers and were engaged in manufacturing during the Audit Periods.

21.     Neither N.C.G.S. § 105-187.51 specifically nor N.C.G.S. § 105-164.3 (the definitional section in Article 5 of the Revenue Act) includes a definition of "manufacturer" or "manufacturing."[2] Accordingly, the Court looks to North Carolina case law to determine the definition of these terms within the meaning of the taxing statutes. In *Duke Power v. Clayton*, our Supreme Court defined manufacturing "as the producing of a new article or use or ornament by application of skill and labor to raw materials." 274 N.C. 505, 514, 164 S.E.2d 289, 295 (1968). In order for an item to be considered manufactured, "the labor must result in a new and different article with a distinctive name, character or use." *Id.* at 513, 164 S.E.2d at 295. The Court in *Duke Power* also noted, however, that "[t]he word *manufacture* is not susceptible of an accurate definition that is all-embracing or all-exclusive, but is susceptible of many applications and many meanings." *Id.* (emphasis in original) (internal quotation marks omitted). Accordingly, while *Duke Power* provides, in a general

---

[2] The Court however notes, though not controlling of the Court's decision herein, that in 2016, the Legislature amended section 105-187.51B to explicitly extend the Privilege Tax to secondary metal recyclers engaged in the same or similar operations as Respondents. N.C. Sess. Law 2016-94, § 38.2(b).

sense, the "usual connotation" for manufacturing, *id.* at 514, 164 S.E.2d at 295, the *Duke Power* definition of manufacturing must be considered in light of the specific industry, products produced, and the customer market at issue.

22.     Here, the undisputed facts show that Respondents transform Scrap Metal that is no longer usable for its intended purpose into new products that have distinct names, characteristics, and uses.  (Bus. Ct. R. 285–90, 296–302, 308–14.) Looking at Respondents' customer base, Respondents' customers are willing and able to purchase Respondents' final products but have no use for the Scrap Metal before it undergoes Respondents' transformation processes.  (Bus. Ct. R. 352.)  For example, scrap steel such as beams or trusses are transformed into "Prepared Plate and Structural," which, to qualify as such, must meet specific composition, density, and size requirements set by the ISRI specifications or other specifications provided by the customer.  (Bus. Ct. R. 352–53, 510.)

23.     Furthermore, looking at the products produced, and comparing those to the original products from which they are derived, there is no question that Respondents have created "a new and different article[.]"  *Duke Power*, 274 N.C. at 513, 164 S.E.2d at 295.  For example, Respondents may purchase a vehicle that, for some reason or another, can no longer be driven (and therefore has lost its intended purpose and value).  Respondents thereafter perform various operations on that vehicle to turn it into a product (or products) that can now be used by a mill or refinery at its facilities.  What was once an unmarketable, post-consumer product has new meaning and new value *because of Respondents' efforts and labor*.  This is exactly

what *Duke Power* contemplates. The same is true for post-consumer aluminum beverage cans: cans that once contained, for instance, beer or carbonated beverage products and have now been discarded as trash are entirely different from Baled Aluminum Used Beverage Can ("UBC") Scrap, which is created only after Respondents dry and clean, flatten, and bale the used cans to a density of 22 pounds per cubic foot and bind them with steel bands. (Bus. Ct. R. 500.) UBC Scrap, but not individual post-consumer beverage cans, will be purchased by Respondents' customers for use at their facilities. (Bus. Ct. R. 342–43.) In essence, Respondents create new life and new purpose for products that have been discarded and have lost their intended value—this is entirely consistent with the *Duke Power* definition of manufacturing.

24. Moreover, even though Respondents do not change the intrinsic composition of the Scrap Metal (i.e. the aluminum beverage can is still aluminum after undergoing Respondents' operations), the Court believes this has no effect on whether a new and different product with a distinctive use has been created. *See, e.g., Brandenburg Indus. Serv. Co. v. Ind. Dep't of State Revenue*, 60 N.E.3d 300, 307 (Ind. Tax. Ct. 2016) ("Logic dictates that a copper wire encased within a cement block is different from a copper wire without the encumbrance of debris, that sorted metal is different from unsorted metal, and that long lengths of metal are different from shorter, cut lengths of metal.").

25. The Court also believes that Respondents' operations are analogous to operations already considered by Petitioner to be manufacturing. According to

Petitioner's own Sales & Use Tax Bulletin, Petitioner classifies persons in the business of ginning cotton (which requires only the separation of seeds from cotton fibers), water purification plants (which transforms untreated water into purified water), and persons who transform water into ice, as manufacturers. (Bus. Ct. R. 1108, 1111, 1115.) The Court concludes that the transformation of water into purified water, of water into ice, or the removal of seeds from cotton is no more an act of "manufacturing" than the transformation undertaken in Respondents' operations. In each instance, the manufacturer removes, separates, or otherwise changes the properties of the old product to produce a new product capable of use by its customers. Just as Respondents' customers here will not purchase used loose aluminum cans for use at its facilities, textile manufacturers will not purchase cotton fibers with seeds, consumers will not use liquid water to cool their beverages, and persons will not consume unpurified water.

26. Petitioner relies on *Duke Power* not only for the definition of manufacturing (which remains good law) but also for its underlying facts. There, our Supreme Court considered whether crushed coal was in an "unmanufactured state." *Duke Power*, 274 N.C. at 513, 164 S.E.2d at 295. At the time of the Supreme Court's decision in 1968, there was no guiding precedent in North Carolina as to whether the crushing of coal constituted manufacturing within the meaning of taxing statutes. *See id.* at 514, 164 S.E.2d at 296. Accordingly, the Supreme Court analogized the crushing of coal to the crushing and screening of quarried rock and recognized that "[t]he majority of jurisdictions . . . [at that time had held] that quarrying and crushing

stone is not manufacturing." *Id.* at 514–15, 164 S.E.2d at 296. Accordingly, the Supreme Court held that crushing coal is not a manufacturing process and crushed coal was purchased in "an unmanufactured state." *Id.* at 516, 164 S.E.2d at 297. Petitioner now contends that crushing coal is no different from Respondents' operations here.

27. Based on the Court's review of the *Duke Power* decision, it appears that Petitioner at that time had not given much guidance regarding its position on what was or was not manufacturing to aid the courts of this State in their analysis. *See id.* at 514, 174 S.E.2d at 296. As a result, and in the absence of case or statutory law in North Carolina interpreting North Carolina taxing statutes, the Supreme Court was required to look to the law of other states in order to assess the meaning of "manufacturing." Under those circumstances, the Supreme Court in *Duke Power* provided a definition for manufacturing and applied it strictly to the facts of that case. However, more than fifty years have passed since the Supreme Court's conclusion in *Duke Power.* Over that time, Petitioner has been called on to determine whether specific processes in differing contexts satisfy the requirements for manufacturing as defined in *Duke Power* and has, on a number of occasions, determined that such processes are, in fact, manufacturing. (*See* Bus. Ct. R. 1100–16 (listing specific industries that are considered manufacturers by Petitioner).) Notably, Petitioner has determined that "[q]uarries . . . regularly operated for the production of stone, sand, clay, marble, granite, gravel, crushed stone and similar products for commercial purposes are deemed to be manufacturing plants and industries[.]" (Bus. Ct. R.

1109.) The subsequent determinations by Petitioner are arguably at odds with the Supreme Court's analysis in *Duke Power*. However, attempting to harmonize Petitioner's position with the Supreme Court's decision in *Duke Power* leads to the inescapable conclusion that at least some of the processes engaged in by Respondents are manufacturing.

28. Lastly, and most importantly as to this first issue, the record reveals that Petitioner concluded in its Notice of Final Determination as to TT&E, that TT&E's Granulator Shredding Operation qualified as manufacturing. (Bus. Ct. R. 710.) The Court is unpersuaded that there is any meaningful difference between this process and the other processes used by Respondents. Petitioner's position would have the Court find that using strippers and sheers (tools purchased by Respondents for which the Privilege Tax is claimed but Petitioner rejected) to create bare brite copper *is not* manufacturing but achieving the same end product through use of a granulator (the machine purchased by TT&E which was permitted by Petitioner to carry the lower tax rate) *is* manufacturing. Respondents argue in their response brief that "[t]he relevant inquiry . . . is whether a new and different product is created— not how that product is created." (Resp. Br. 19 (emphasis original).) The Court agrees. As Petitioner itself concedes, manufacturing is defined in terms of the final product produced: *Duke Power* defines manufacturing "as *the producing of a new article or use or ornament* by application of skill and labor to raw materials." 274 N.C. at 514, 164 S.E.2d at 295 (emphasis added).

29.     Accordingly, based on the foregoing, the Court concludes that Respondents are engaged in manufacturing and that the ALJ did not err in reaching such a conclusion in the Final Decision.

C. The ALJ Erred in Failing to Engage in a Purchase-by-Purchase Analysis

30.     Although the ALJ correctly determined that Respondents are engaged in manufacturing, the Court concludes that the ALJ nevertheless erred as a matter of law by not conducting a purchase-by-purchase analysis of each Respondent's items purchased during the Audit Periods to determine if each item was "mill machinery or mill machinery parts or accessories" used in the manufacturing process.

31.     Based on a clear reading of N.C.G.S. § 105-187.51, while being a manufacturer is a prerequisite to being eligible for the Privilege Tax, not all items purchased by a manufacturer are entitled to the lower rate of taxation. Rather, N.C.G.S. § 105-187.51 requires a two-step analysis: first, there must be a determination that the purchaser is a "manufacturing industry or plant[,]" and second, there must be a determination that the purchases are of "mill machinery or mill machinery parts or accessories[.]" N.C.G.S. § 105-187.51(a)(1). Furthermore, N.C.G.S. § 105-187.51(b) provides that the Privilege Tax is "one percent (1%) of the purchase price of the machinery, part, or accessory purchased." Therefore, when assessing whether the Privilege Tax is applicable, a purchase-by-purchase analysis must be done. It would be in error, based on the plain meaning of the statute, to assume all items purchased by a manufacturer are subject to the Privilege Tax.

32.     Respondents each purchased numerous items during the respective Audit Periods for which the Privilege Tax was claimed.  It appears to the Court that the parties did not provide sufficient evidence (or arguments to the contrary) to the ALJ of the use of each individual item purchased by Respondents during the Audit Periods and, accordingly, that the ALJ could not and did not analyze in the Final Decision whether each item purchased by each Respondent was an item used in the manufacturing process.  The Court believes this was in error, and accordingly, remands these consolidated matters to the OAH for further proceedings to conduct a purchase-by-purchase analysis.

33.     In doing so, the Court believes that the ALJ should determine whether the items purchased were used in the production phase of manufacturing.  Pursuant to Petitioner's interpretation of the Privilege Tax statute, only those items used in the "production" phase of manufacturing qualify for the Privilege Tax.  (Bus. Ct. R. 1083.)    During the respective Audit Periods at issue, 17 North Carolina Administrative Code 07D.0102(a)(1), which controls determination of the applicability of the Privilege Tax to individual purchases, provided that:

> "[P]urchases by a manufacturing industry or plant of machinery, and parts and accessories therefore for use in production . . . are classified as mill machinery, and mill machinery parts and accessories . . . . Production *does not include any activity connected with the movement of raw materials or ingredients into inventory* . . . . Sales to manufacturing industries and plants of machinery, parts and accessories to such machinery, or other items of tangible personal property which are used in the movement of raw materials or ingredients into inventory or . . . which are used for other similar purposes are subject to the applicable statutory state and local sales or use tax."

17 N.C. Admin. Code 07D.0102(a)(1) (emphasis added).

34. Accordingly, based on the Administrative Code, purchases of items used for the movement of raw materials into inventory are not subject to the Privilege Tax. The Court finds no other authority contrary to this position, nor have Respondents presented the Court with an alternative position. In fact, the record reveals that counsel for Respondents "concur[red] . . . that items used in the gathering and bringing [of] materials to the [manufacturing facility] under the statute for this period do not qualify" for the Privilege Tax. (Bus. Ct. R. 945.)

35. The Final Decision by the ALJ lacks any analysis as to whether each of the purchases at issue were in fact used by Respondents in manufacturing (and specifically in the production phase of manufacturing). Rather, it appears that the ALJ assumed, without proof, that all claimed purchases were entitled to the lower Privilege Tax because the ALJ concluded as a matter of law that Respondents were manufacturers. (*See* Bus. Ct. R. 1138, Conclusion of Law No. 29.) The record before the ALJ, however, reveals that purchases for which the lower Privilege Tax was claimed include products which were seemingly used for purposes other than manufacturing. For instance, Respondents claimed the Privilege Tax was applicable to purchases of computer equipment and printer ink cartridges. (*See, e.g.*, Bus. Ct. R. 666, 709.)

36. As a result, finding Petitioner's interpretation of N.C.G.S. § 105-187.51 instructive, and giving Petitioner deference in this regard, only those items used in the production phase of manufacturing are subject to the Privilege Tax. Because the ALJ did not limit her conclusion to items used in the production phase of

manufacturing or conduct a purchase-by-purchase analysis to determine whether each of the items at issue purchased by Respondents was utilized in this way, the Court remands these consolidated cases to the OAH to determine whether each item purchased by Respondents during the Audit Periods is properly considered mill machinery, parts, or accessories used during the production phase of manufacturing and thus entitled to the Privilege Tax rate.

## IV. CONCLUSION

37. For the reasons set forth above, the Court concludes that the Final Decision granting summary judgment in Respondents' favor, denying Petitioner's motion for summary judgment, and reversing Petitioner's Notices of Final Determination, should be **AFFIRMED** to the extent the ALJ determined that Respondents are manufacturers. However, the Court **REVERSES** the Final Decision to the extent the ALJ concluded that all items purchased by Respondents are subject to the Privilege Tax. The Court orders that these consolidated matters be **REMANDED** for further proceedings and a determination by the OAH, based on a purchase-by-purchase analysis, as to whether each item purchased by Respondents during the respective Audit Periods was used during the production phase of manufacturing.

SO ORDERED, this the 8th day of July, 2019.

/s/ Michael L. Robinson
_____
Michael L. Robinson
Special Superior Court Judge
  for Complex Business Cases