N.C. Dep't of Revenue v. FSC II, LLC, 2023 NCBC 9.

STATE OF NORTH CAROLINA

WAKE COUNTY

NORTH CAROLINA DEPARTMENT OF REVENUE,

Petitioner,

v.

FSC II, LLC,

Respondent.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
22 CVS 5410

**ORDER AND OPINION ON PETITION FOR JUDICIAL REVIEW**

**THIS MATTER** comes before the Court on Petitioner North Carolina Department of Revenue's Petition for Judicial Review (the "Petition," ECF No. 3) seeking reversal of the Office of Administrative Hearings' Final Decision (the "Final Decision") entering summary judgment in favor of Respondent FSC II, LLC.

After considering the Petition, the administrative record, the parties' briefs, the arguments of counsel, and all other appropriate matters of record, **THE COURT**, for the reasons set forth below, hereby **AFFIRMS** the Final Decision.

*North Carolina Department of Justice, by Special Deputy Attorney Generals Ashley Hodges Morgan and Tania X. Laporte-Reveron, for Petitioner North Carolina Department of Revenue.*

*K&L Gates, LLP, by A. Lee Hogewood III, Robert B. Womble, and Zachary S. Buckheit, for Respondent FSC II, LLC.*

Davis, Judge.

## INTRODUCTION

1.    To be a manufacturer or not to be a manufacturer?  That is the question in this tax appeal.  A former North Carolina statute provided an exemption to the North Carolina Sales and Use Tax Act that applied to "[a] manufacturing industry or

plant that purchases mill machinery . . . parts or accessories for storage, use, or consumption in this State."[1]  The taxpayer company in this case—FSC II, LLC ("FSC")—existed primarily as a contractor.  In the course of its normal work, FSC regularly purchased raw materials that it then used to create hot mix asphalt ("HMA").  FSC primarily used this HMA in fulfilling its existing construction contracts but sold the remaining amounts of its HMA to third parties.  Based on these facts, FSC contends that it qualified as a manufacturer for purposes of the Mill Machinery Exemption and was therefore liable only for a lower *privilege* tax on the raw materials it purchased rather than the higher sales or use tax.[2]  The North Carolina Department of Revenue (the "Department") disagrees.  In resolving the parties' dispute, the Court must determine what it means to be a manufacturer for purposes of the Mill Machinery Exemption and how that classification applies under the circumstances of this case.

## FACTUAL AND PROCEDURAL BACKGROUND

2.      The material facts of this matter are not in dispute.[3]

3.      The Department is the North Carolina agency tasked with administering state tax laws and regulations, including the North Carolina Sales and

---

[1] Throughout this opinion, the Court refers to this exemption as the "Mill Machinery Exemption."

[2] The present appeal solely concerns FSC's *out-of-state* purchases of these raw materials.

[3] Indeed, the parties submitted a Joint Stipulation of Facts in the proceedings before the Office of Administrative Hearings, which are quoted in relevant part herein.

Use Tax Act (hereinafter the "Sales and Use Tax Act" or the "Act"). *See* N.C.G.S. §§ 143B-218, 105-164.1, *et seq.* (2021).

4. In their Joint Stipulation of Facts, the parties stipulated, in pertinent part, as follows:

[a.] From January 1, 2012 to December 31, 2014 ("Period at Issue"), [FSC] primarily engaged in public infrastructure construction and commercial sitework construction. Additionally, during the Period at Issue, [FSC] owned and operated four facilities in Wake County, North Carolina that produced hot mix asphalt ("HMA"). While the parties stipulate that the process of converting raw materials to HMA primarily for resale constitutes "manufacturing," [FSC] contends that it is a manufacturer operating a manufacturing plant within the meaning of the statute and regulations at issue and the [Department] disagrees. The parties stipulate that this disagreement may be resolved as a matter of law and not as a matter of fact.

[b.] For tax years 2012 to 2014, [FSC]'s parent company, which files income tax returns reflecting [FSC]'s business operations, identified itself as being in the "Highway, Street, and Road Construction" industry under the North American Industry Classification System on the parent's North Carolina income tax returns.

[c.] During tax year 2012, [FSC] used 85.46% of the HMA it produced at its HMA facilities for various construction projects upon which it served as a contractor or subcontractor and sold the remaining HMA in FOB sales to North Carolina customers.

[d.] During tax year 2013, [FSC] used 79.73% of the HMA it produced at its HMA facilities for various construction projects upon which it served as a contractor or subcontractor and sold the remaining HMA in FOB sales to North Carolina customers.

[e.] During tax year 2014, [FSC] used 81.10% of the HMA it produced at its HMA facilities for various construction projects upon which it served as a contractor or subcontractor and sold the remaining HMA in FOB sales to North Carolina customers.

[f.] During the Period at Issue, [FSC] paid North Carolina sales tax at the full applicable rates for tangible personal property ("TPP") that it purchased in North Carolina, including tools, parts, and equipment that it used in producing HMA in state. During the Period at Issue, [FSC] did not pay sales tax or accrue and remit use tax for certain TPP that it purchased out of state, including tools, parts, and equipment that it used in producing HMA in state. It is [FSC]'s position that the law did not require [FSC] to pay sales or use tax for TPP that [FSC] used in producing HMA in state, to the extent such TPP constitutes "mill machinery or mill machinery parts or accessories" within the meaning of N.C.G.S. [§] 105-187.51 as in effect at the applicable times.

[g.] [FSC] did not pay the North Carolina privilege tax under former N.C.G.S. § 105-187.51, which was in effect during the Period at Issue, on [FSC]'s out-of-state purchases of tools, parts, and equipment that it used to produce HMA in North Carolina.

[h.] During the Period at Issue, [FSC] charged and remitted the correct sales tax due on its North Carolina sales of HMA.

(R., ECF No. 12, at RP_0070–71.)

5. In October 2014, FSC received a notice from the Department of a sales and use tax examination scheduled to commence on 4 November 2014. (R., at RP_0072.)

6. On 9 December 2015, as a result of that examination, the Department issued a "Notice of Sales & Use Tax Assessment," proposing the assessment against FSC of additional state and county sales and use taxes during the Period at Issue in the principal amount of $118,999.78, plus a 10% negligence penalty and interest with respect thereto (the "Proposed Assessment"). (R., at RP_0073.) In calculating the Proposed Assessment, the Department reviewed FSC's 2014 invoices for FSC's out-of-state TPP purchases, including FSC's purchases of tools, parts, and equipment for HMA production in state, but not the invoices for the same types of purchases from

2012 and 2013. Instead, for years 2012 and 2013, the Department used a formula to project FSC's sales and use tax liability. However, FSC disputed whether the Department was legally permitted to use such projections, in lieu of actually reviewing the relevant invoices. (R., at RP_0073.)

7. As a result of this dispute over the appropriate methodology, FSC timely requested that the Department review the Proposed Assessment. (R., at RP_0073.) On 19 June 2018, after reviewing FSC's 2012 and 2013 invoices, the Department issued to FSC proposed adjustments to the Proposed Assessment. (R., at RP_0073.)

8. The proposed adjustments reflected that, during the Period at Issue, the invoices for FSC's out-of-state TPP purchases, including FSC's purchase of tools, parts, and equipment for HMA production in state, totaled $2,144,144.45, resulting in higher tax liability for FSC. (R., at RP_0074.)

9. On 14 August 2019, FSC representatives, FSC's counsel, and Department representatives participated in a conference as required by N.C.G.S. § 105-241.13(b). (R., at RP_0074.) Following that conference, the Department issued a Notice of Final Determination ("NOFD"), as required by N.C.G.S. § 105-241.14(b). (R., at RP_0074.)

10. The NOFD stated that—based on the proposed adjustments to the Proposed Assessments—FSC owed $118,999.78 in state and local sales and use taxes, $11,899.98 in penalties, and $52,422.89 in interest through 31 March 2020, less interest adjustments of $4,602.25, resulting in a total amount of $178,720.40 in taxes owed to the Department. (R., at RP_0170.) The NOFD also stated that after

reviewing FSC's objections, the Department had "determined that the assessment proposed against [FSC], as adjusted, is correct." (R., at RP_0170.) Furthermore, the NOFD noted that "[t]he net effect of the aforementioned adjustments to the Proposed Assessment is an increase in the Taxpayer's overall Tax liability." (R., at RP_0174.) However, the Department chose not to increase FSC's tax liability as a result of FSC's request for review and only sought recovery of the original amount stated in the Proposed Assessment—that is, $118,999.78—plus a 10% negligence penalty and interest. (R., at RP_0174.)

11.    Of the $118,999.78 that the Department contended was owed by FSC, the parties agreed that FSC owed at least $44,479.75 in use taxes plus applicable interest for out-of-state TPP purchases that FSC conceded did not involve manufacturing tools, parts, or equipment. (R., at RP_0074.)

12.    However, FSC disputed that it owed any of the remaining $74,520.03 in use tax, interest, and penalties. FSC asserted that its out-of-state purchases of tools, parts, and equipment for HMA production were subject only to the North Carolina privilege tax under N.C.G.S. § 105-187.51 by virtue of the Mill Machinery Exemption, plus interest. (R., at RP_0074–75.)[4]

13.    Conversely, the Department maintained its position that FSC did, in fact, owe the remaining $74,520.03 based on its position that these tools, parts, and equipment were not subject to the Mill Machinery Exemption. (R., at RP_0075.)

---

[4] Although not relevant to this appeal, FSC also disputed that the 10% negligence penalty was applicable to any privilege tax it owed under N.C.G.S. § 105-187.51.

14.     On 24 April 2020, FSC filed a Petition for Contested Tax Case Hearing with the Office of Administrative Hearings ("OAH") pursuant to N.C.G.S. § 150B-23. (R., at RP_0897.)   Subsequently, the parties filed cross-Motions for Summary Judgment.  (R., at RP_0897.)

15.     Following briefing and a hearing, Administrative Law Judge Melissa Owens Lassiter (the "ALJ") issued a Final Decision in this matter on 4 April 2022. (R., at RP_0897.)

16.     Based on the Joint Stipulation of Facts submitted by the parties, the Final Decision addressed the following two issues:

[(i)]     Whether [FSC]'s purchases of tools, parts, and equipment from vendors located outside North Carolina, from July 1, 2012 through December 31, 2014, which [FSC] used in its asphalt plants in North Carolina to produce hot mix asphalt, were exempt from use taxes under N.C. Gen. Stat. § 105-164.13(5a) and N.C. Gen. Stat. 105-187.51?

[(ii)]    Whether [the Department's] Notice of Final Determination proposing an assessment of $118,999.78 in use taxes, plus penalties and interest, against [FSC] for purchases of tools, parts, and equipment from vendors located outside North Carolina, which [FSC] then used in its asphalt plants in North Carolina, from July 1, 2012 through December 31, 2014, was correct?

(R., at RP_0898.)

17.     In the Final Decision, the ALJ granted summary judgment for FSC regarding its entitlement to the Mill Machinery Exemption based on the ALJ's determination that FSC's use of the TPP it purchased to produce HMA constituted "manufacturing" such that FSC was therefore exempt from the sales and use tax. (R., at RP_0918–19.)  The ALJ directed the Department to issue a new Notice of Final

Determination that was consistent with the rulings contained within the Final Decision.  (R., at RP_0920.)

18.    On 4 May 2022, the Department filed its Petition seeking judicial review in Wake County Superior Court.  The matter was subsequently designated as a complex business case by the Chief Justice of the Supreme Court of North Carolina and assigned to the undersigned.  The Department and FSC each submitted briefs in support of their respective positions.  On 14 December 2022, the Court held a hearing on the Petition, at which both parties were represented by counsel.  The Petition is now ripe for resolution.

## LEGAL STANDARD

19.    When a trial court "exercises judicial review over an agency's final decision, it acts in the capacity of an appellate court." *Meza v. Div. of Soc. Servs.*, 364 N.C. 61, 75 (2010) (quoting *N.C. Dep't of Env't & Nat. Res. v. Carroll*, 358 N.C. 649, 662 (2004)).

20.    Chapter 150B of the North Carolina General Statutes provides that "[t]he court reviewing a final [agency] decision may affirm the decision or remand the case for further proceedings [and] [i]t may also reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced[.]" N.C.G.S. § 150B-51(b) (2021).  "In reviewing a final decision in a contested case, the court shall determine whether the petitioner is entitled to the relief sought in the petition based upon its review of the final decision and the official record." *Id*. § 150B-51(c).

21.     Here, the Department appeals the Final Decision of the OAH granting summary judgment in favor of FSC. "Appeals arising from summary judgment orders are decided using a *de novo* standard of review." *Midrex Techs. v. N.C. Dep't of Revenue*, 369 N.C. 250, 257 (2016). Under the *de novo* standard of review, the Court will "consider[] the matter anew and freely substitute[] its own judgment" for that of the OAH. *Carroll*, 358 N.C. at 660 (quoting *Mann Media, Inc. v. Randolph Cnty. Planning Bd.*, 356 N.C. 1, 13 (2002)). "In reviewing a final decision allowing . . . summary judgment, the court may enter any order allowed by . . . Rule 56" of the North Carolina Rules of Civil Procedure. N.C.G.S. § 150B-51(d).

22.     Under Rule 56, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to . . . judgment as a matter of law." N.C. R. Civ. P. 56(c). A genuine issue is "one that can be maintained by substantial evidence." *Dobson v. Harris*, 352 N.C. 77, 83 (2000). A material fact is one that "would constitute or would irrevocably establish any material element of a claim or defense." *Abner Corp. v. City Roofing & Sheetmetal Co.*, 73 N.C. App. 470, 472 (1985). "Summary judgment is appropriate if . . . the facts are not disputed and only a question of law remains." *Wal-Mart Stores E. v. Hinton*, 197 N.C. App. 30, 37 (2009) (quoting *Carter v. W. Am. Ins. Co.*, 190 N.C. App. 532, 536 (2008)). Thus, where—as here—the material facts are undisputed on appeal, "a summary disposition of the claims is proper and

appropriate." *Technocom Bus. Sys. v. N.C. Dep't of Revenue*, 2011 NCBC LEXIS 1, at *12 (N.C. Super. Ct. Jan. 4, 2011).

23. FSC, as the "taxpayer claiming a deduction," must bring itself "within the statutory provisions authorizing the deduction." *Wal-Mart Stores E.*, 197 N.C. App. at 54–55 (quoting *Ward v. Clayton*, 5 N.C. App. 53, 58 (1969)).

## ANALYSIS

24. The sole issue before the Court is whether the ALJ erred in granting summary judgment in favor of FSC on the basis that the TPP purchased by FSC from out-of-state for its production of HMA should be subject to the lower 1% privilege tax as opposed to the higher sales or use tax. Or, stated more succinctly, the issue is whether the ALJ correctly determined that FSC was entitled to the Mill Machinery Exemption. In analyzing this issue, it is necessary to first review the statutory provisions relevant to this issue as they existed during the relevant time period.

25. The North Carolina Sales and Use Tax Act (the "Act"), N.C.G.S. § 105-164.1 *et seq.*, as applicable to this dispute,[5] imposed a retail sales tax on a retailer's net taxable sales or gross receipts, as appropriate, from sales at retail at the general State rate, as well as the applicable local and transit rates of tax. N.C.G.S. §§ 105-164.4(a), 105-467, 105-483, 105-498, 105-509.1, 105-537 (2014). A retailer was defined, in part, as "[a] person engaged in the business of . . . making sales at retail[.]" *Id.* § 105-164.3(35). The Act provided, in pertinent part, that "[t]he general rate of tax applies to the sales price of each item or article of tangible personal property that

---

[5] In 2017, N.C.G.S. § 105-187.51 was repealed. *See* N.C. Session Laws 2017-57 s. 38.8(a), effective July 1, 2018 and applicable to sales made on or after that date.

is sold at retail and is not subject to tax under another subdivision in this section." *Id.* § 105-164.4(a)(1). For purposes of the Act, "sales price" was defined in relevant part as "[t]he total amount or consideration for which tangible personal property, digital property, or services are sold" and specifically included the retailer's cost of the property sold; the cost of materials used, labor or service costs; all costs of transportation to the retailer; charges by the retailer for any services necessary to complete the sale; delivery charges; and installation charges. *Id.* § 105-164.3(37).

28. The Act also imposed a complementary use tax on products purchased, leased, or rented for storage, use, or consumption in the State. *Id.* §§ 105-164.6, 105-468, 105-483, 105-498, 105-509.1, 105-537. This use tax was imposed as an "excise tax" and was levied on the purchase price of tangible personal property. *Id.* §§ 105-164.3(33), 105-164.6(a). Pursuant to the Act, the "person who purchases, leases, or rents tangible personal property" was liable for payment of the use tax. *Id.* § 105-164.4(6)(b).

27. However, the Act also set out certain exemptions. N.C.G.S. § 105-164.13 provided that "[t]he sale at retail and the use, storage, or consumption in this State of the following tangible personal property . . . are specifically exempt from the tax imposed by this Article[.]" The ensuing list of exempted property included "[p]roducts that are subject to tax under Article 5F of this Chapter." *Id.* § 105-164.13(5a).

28. Article 5F included the "Mill Machinery Exemption" contained within section 105-187.51, which stated, in pertinent part, as follows:

**§ 105-187.51. Tax imposed on mill machinery.**

(a)     Scope.—A privilege tax is imposed on the following persons:

(1)     A manufacturing industry or plant that purchases mill machinery or mill machinery parts or accessories for storage, use or consumption in this State.  A manufacturing industry or plant does not include the following:

a.     A delicatessen, cafe, cafeteria, restaurant, or another similar retailer that is principally engaged in the retail sale of foods prepared by it for consumption on or off its premises.

b.     A production company.

. . .

(b)     Rate.—The tax is one percent (1%) of the sales price of the machinery, part, or accessory purchased.  The maximum tax is eighty dollars ($80.00) per article.  As used in this section, the term "accessories" does not include electricity.

*Id.* § 105-187.51.

29.     Notably, the statute did not expressly define the phrase "manufacturing industry or plant" or, for that matter, any variation of the word "manufacture."

30.     Because section 105-187.51 granted an exemption from the otherwise applicable rate of sales and use tax, a taxpayer seeking the exemption "bears the burden of showing, by a preponderance of the evidence, that it is eligible for the lower rate of taxation and is entitled to remit the 1% Privilege Tax rather than the general State and local rates of tax." *N.C. Dep't of Revenue v. Tri-State Scrap Metal*, 2019 NCBC LEXIS 42, at *14 (N.C. Super. Ct. July 8, 2019).

31.     In this appeal, the Department argues that FSC cannot be deemed to be a "manufacturing industry or plant" because at all relevant times it was a *contractor*

rather than a *manufacturer*. The Department asserts that the TPP purchased by FSC from out-of-state is subject to the general rate of use tax—as opposed to the lower 1% privilege tax—because FSC was "primarily engaged in the construction of public infrastructure projects and performed commercial sitework, such as paving roads and parking lots" and used the majority of the HMA it produced in completing those projects. (Pet.'s Br. Supp., ECF No. 15, at 2.)[6]

32. FSC, conversely, contends the ALJ correctly determined that it is entitled "to the then applicable favorable tax treatment for out of state purchases of manufacturing machinery in the operation of its hot mix asphalt manufacturing business and plants for the Relevant Period." (Resp't's Br. Opp., ECF No. 16, at 2.) FSC contends that it is entitled to this favorable tax treatment because it acted as a "manufacturer" and "manufacturing industry" within the meaning of the Mill Machinery Exemption during the Period at Issue.

33. Thus, the heart of the parties' dispute concerns whether FSC qualifies as a "manufacturing industry or plant." Although, as noted above, N.C.G.S. § 105-187.51 does not define the term "manufacturing," our Supreme Court has stated the following regarding the meaning of the term in a case involving an analogous issue:

> It is everywhere conceded that the term *manufacturing* as used in tax statutes is not susceptible of an exact and all[-]embracing definition, for it has many applications and meanings. Where, as here, the statute does not define the term, courts have resorted to the dictionaries to ascertain its generally accepted meaning and have then undertaken to determine its application to the circumstances of the particular case. There are many holdings and statements to the effect that to constitute

---

[6] The Department notes that the tax on the purchases of TPP at issue are not subject to apportionment because "the use tax is not divisible or subject to apportionment because of its one-time application to the purchase transaction." (Pet.'s Br. Supp., at 12.)

manufacturing, the operation, process, or activity in question must produce a new and different commodity or work a substantial change in the basic material.

*Master Hatcheries, Inc. v. Coble*, 286 N.C. 518, 520–21 (1975) (emphasis in original)

(citing *Duke Power Co. v. Clayton, Comr. of Revenue*, 274 N.C. 505 (1968)).

34.     Furthermore, in *Duke Power*, the Supreme Court elaborated on this proposition:

In its generic sense, "manufacturing" has been defined as the producing of a new article or use or ornament by the application of skill and labor to the raw materials of which it is composed . . . . To make an article manufactured, the application of the labor must result in a new and different article with a distinctive name, character, or use . . . . Thus, the usual connotation of manufacturing is the making of a new product from raw or partly wrought materials.

*Duke Power*, 274 N.C. at 513–14.

35.     The Department does not dispute that the process of producing HMA using the parts and equipment at issue that were purchased by FSC is consistent with the above-quoted definition of manufacturing as articulated by our Supreme Court.  Nor does the Department contend that the TPP purchased by FSC did not constitute "mill machinery or mill machinery parts or accessories for storage, use or consumption in the State."  N.C.G.S. § 105-187.51.

36.     Instead, the Department argues that FSC's creation of HMA, by itself, is not enough to transform it into a "manufacturing industry or plant" for purposes of the Mill Machinery Exemption.  The Department contends that FSC must also show that it was primarily, or principally, engaged in the *sale* of the HMA it produced in

order to qualify for the exemption.[7] FSC is unable to do so, the Department asserts, due to the fact that during the relevant time period it was instead primarily engaged in its work as a contractor rather than as a retail seller of HMA. In support of this assertion, the Department points to the undisputed evidence of record showing that during each of the relevant years FSC used between 79.73% and 85.46% of the HMA it produced on construction projects for which it served as a contractor or subcontractor.

37.    In a related argument, the Department further contends that section 105-187.51(a)(1) is ambiguous due to the fact that it does not expressly address circumstances where, as here, a taxpayer "manufactures" a product but mainly uses that product for its own purposes—rather than selling it to third parties. In light of this existing ambiguity coupled with the fact that this statutory provision creates an exemption from taxation, the Department contends, section 105-187.51(a)(1) should be construed narrowly and in accordance with the Department's proffered interpretation.

38.    In response, FSC claims that the Department is making up out of whole cloth a de facto "51% rule" under which FSC would only be entitled to the Mill Machinery Exemption if it sold to third parties at least 51% of the HMA it produced. FSC contends that neither the actual language of section 105-187.51 nor any decision from our appellate courts supports the Department's interpretation. Ultimately, FSC's position is that as long as it purchased the TPP at issue in order to produce

---

[7] The Court observes that the Department asserted several additional arguments before the OAH that it has not advanced in this appeal.

HMA that it then proceeded to use for any business-related purpose, it should be deemed a "manufacturing industry or plant" for purposes of the exemption. Thus, under FSC's interpretation, it need not have sold *any* of its HMA to third parties in order to qualify for the Mill Machinery Exemption.

39.     Although there is a small handful of cases from our appellate courts that have analyzed issues bearing some relation to the present question, there is no case entirely—or even mostly—on point. However, the Department's argument is based primarily upon its interpretation of our Supreme Court's decision in *In re Clayton-Marcus Co.*, 286 N.C. 215 (1974).

40.     *Clayton-Marcus* required the Supreme Court to determine whether a company qualified for a then-existing manufacturing exemption from the sales and use tax. The taxpayer, Clayton-Marcus, was a manufacturer of furniture. For promotional purposes, it assembled swatch books of fabrics that were to be distributed for free to potential customers. It argued that its use of the fabrics to make the swatch books constituted "manufacturing" so as to entitle it to the manufacturing exemption. *Id.* at 218–22.

> Clayton-Marcus . . . contends that even if its handling of the fabric in the compilation of the swatch books here in question is a "use" of the fabric, within the meaning of the Sales and Use Tax Act, it is exempted from the use tax by G.S. 105-164.13, which provides:
>
> "*Retail Sales and Use Tax.*["] -- The sale at retail, the use, storage or consumption in this State of the following tangible personal property is specifically exempted from the tax imposed by this Article:
>
> * * * *

"(8) Sales of tangible property to a manufacturer which enters into or becomes an ingredient or component part of tangible personal property which is manufactured."

*Id.* at 222–23 (quoting former N.C.G.S. § 105-164.13).

41.    The Supreme Court then summarized the Department's opposing argument:

> The State contends that Clayton-Marcus is a manufacturer of furniture, so that its use of so much of the fabric as becomes a component part of furniture is not subject to the Use Tax, but that Clayton-Marcus is not a manufacturer of the swatch books, which it distributes to its customers, because it gives those swatch books to its customers without charge. That is, the State contends that one is not a manufacturer of articles which he makes for the purpose of distribution without charge, but is merely a consumer or user of the materials from which he makes such article.

*Id.* at 223.

42.    The Supreme Court framed the key issue in the case as "whether Clayton-Marcus is a 'manufacturer' of the swatch books involved in this appeal." *Id.*

43.    Applying its prior definition of the term "manufacture" as set out in *Duke Power*, the Supreme Court recognized that a swatch book "is a new and different article from the fabrics." *Id.* at 224. Nevertheless, the Court ultimately concluded that Clayton-Marcus did not "manufacture" the swatch books within the meaning of the exemption. The Supreme Court articulated its rationale as follows:

> In our opinion, a swatch book or sample book is a new and different article from the fabrics in the respective samples contained therein. Thus, nothing else appearing, Clayton-Marcus has "manufactured" these swatch books . . . . In the construction of this statutory exemption, however, we should not press the word "manufactured" to its dryly logical extreme in disregard of the obvious purpose of the Sales and Use Tax Act. It is clear that the purpose of the Act, as a whole, is to impose

a use tax (credited with a sales tax previously paid by the user) upon the consumer or user of tangible personal property in this State.

As the State points out in its brief, a lady who bakes a cake, or makes a child's dress, for the purpose of giving it to a neighbor is not a "manufacturer" within the meaning of G.S. 105-164.13(8), notwithstanding the fact that, by the application of skill and labor to raw materials, she has created a new and different article. To hold otherwise would defeat the purpose of the Use Tax Act by giving the word "manufactured" a meaning which it does not have in its ordinary usage. The distinction between such a lady and the commercial bakery or the commercial dress shop is not, however, confined to the fact that she makes no charge for her product. We are not required, in this instance, to determine whether one who devotes a substantial plant to the preparation of food or clothing, which he donates to a charitable agency, should be deemed a "manufacturer" within the meaning of this exemption statute.

In the present instance, Clayton-Marcus is not distributing the swatch books in question to its potential customers as gifts. It is distributing them as advertising matter for the purpose of soliciting sales of its furniture. It is as if Clayton-Marcus had purchased paper, ink and other printing materials from which it produced, in its own plant, catalogues, containing pictures and descriptions of furniture manufactured by it for sale, and had distributed such catalogues among potential customers for its furniture. The purpose of the producer of such catalogue or swatch book is thereby to increase its own business, not to benefit the recipient of the book. The catalogue or the swatch book is created for use (by distribution) by the producer itself as an instrumentality in the conduct of the producer's own business.

*Id.* at 224–25.

44.     Based on this reasoning, the Supreme Court concluded that the swatch books were not "manufactured" within the meaning of the exemption. *Id.* at 225.

We hold that the exemption provided in G.S. 105-164.13(8) was not intended by the Legislature to apply, and does not apply, to use of material by a manufacturer in the production of an article intended for use by the manufacturer, itself, through its distribution to potential customers as sales promotional material.

Thus, we hold that the use, in North Carolina, by Clayton-Marcus of fabric in the production of swatch books for distribution, without charge, to its potential customers, in or out of this State, is not exempted by G.S. 105-164.13(8) from the Use Tax imposed by G.S. 105-164.6.

*Id.* at 226.[8]

45.     The Department also attempts to rely on our Court of Appeals' decision in *Oscar Miller Contractor, Inc. v. N.C. Tax Review Bd.*, 61 N.C. App. 725 (1982). However, although *Oscar Miller* was based on facts resembling those presented here and a similarly worded prior version of the Mill Machinery Exemption, the Court of Appeals' resolution of the case was based on a regulation from the Secretary of Revenue that was repealed prior to the time period at issue in the present case. *Id.* at 729–30. Therefore, the Court of Appeals did not actually address the question at issue here and, for this reason, *Oscar Miller* provides little assistance in resolving the issue presently before the Court.

46.     Nevertheless, the Department points to the following statement by the Court of Appeals in *Oscar Miller* attempting to summarize the reasoning employed by the Supreme Court in *Clayton-Marcus*:

Our Supreme Court said it is clear that the purpose of the Sales and Use Tax Act is to impose a use tax, credited with any sales tax previously paid, upon the user of any tangible personal property in this state. If the property is used to produce something which will add to the taxpayer's profit but the thing produced will not be sold subject to the sales tax, the sale of the property is not a sale to a manufacturer within the meaning of the Sales and Use Tax Act.

*Id.* at 729.

---

[8] However, the Supreme Court ultimately determined that Clayton-Marcus was not, in fact, liable for the tax assessed because the use of the fabrics in the swatch books was not a "use" within the definition contained in the Act. *Id.* at 226.

47. As an initial matter, *Clayton-Marcus* undercuts the Department's argument that the phrase "manufacturing industry or plant" in section 105-187.51(a)(1) is ambiguous. Although the Supreme Court noted that the statutory definition of a separate term—the word "storage"—contained in the Sales and Use Tax Act was ambiguous, 286 N.C. at 221, the Supreme Court made no accompanying finding of ambiguity in the words "manufacturer" or "manufactured." Instead, the Supreme Court applied the definition of "manufacture" as previously articulated in *Duke Power* and proceeded to analyze the taxpayer's entitlement to the manufacturing exemption utilizing that definition.[9]

48. The Department asks this Court to infer from the Supreme Court's reasoning in *Clayton-Marcus* a requirement that in order to qualify for the Mill Machinery Exemption a taxpayer must use the TPP it purchases to produce a product (in this case, HMA) for the primary or principal purpose of selling it to third parties.

49. The Court declines to accept the Department's request. The Court has carefully read—and reread—*Clayton-Marcus* and is unable to find support therein for the Department's interpretation.

50. Moreover, nothing in the statutory language of section 105-187.51(a)(1) contains such a requirement or otherwise suggests that the General Assembly intended to create one. It is axiomatic that courts generally refrain from judicially

---

[9] Although the Court of Appeals commented in *Oscar Miller* after reaching its result that "[t]he statute in this case is ambiguous and there has not been a square holding by a court which defines it[,]" 61 N.C. App. at 730, that statement is clearly *dicta* and therefore lacks precedential value. *See State v. Scoggin*, 236 N.C. 1, 13 (1952) (stating that "[t]he various statements in the Court's opinion which were not necessary to the decision of that precise question constitute *obiter dicta*, and have no effect as declaring the law").

inserting language in a statute that the legislature did not see fit to include. *See, e.g.*, *Lunsford v. Mills*, 367 N.C. 618, 623 (2014) ("[I]n effectuating legislative intent, it is our duty to give effect to the words actually used in a statute and not to delete words used or insert words not used.") (cleaned up).

51. By way of comparison, in several other provisions of North Carolina's tax statutes, the General Assembly has expressly added to the statutory text the sort of "principal or primary" language the Department asks the Court to engraft here. *See e.g.*, N.C.G.S. § 105-187.51B(a)(2) ("A company *primarily* engaged at the establishment in research and development activities in the physical, engineering, and life sciences") (emphasis added); N.C.G.S. § 105-187.51B(a)(4) ("A company *primarily* engaged at the establishment in industrial machinery refurbishing activities") (emphasis added); N.C.G.S. § 105-187.51D ("For the purposes of this section, a 'large manufacturing and distribution facility' is a facility that is to be used *primarily* for manufacturing or assembling products and distributing finished products") (emphasis added). Indeed, the General Assembly did so as well in one of the two listed exceptions in N.C.G.S. § 105-187.51(a)(1) itself. *See* N.C.G.S. § 105-187.51(a)(1)a. ("A manufacturing industry or plant does not include the following: A delicatessen, cafe, cafeteria, restaurant, or another similar retailer that is *principally* engaged in the retail sale of foods prepared by it for consumption on or off its premises.") (emphasis added).

52. The Department cites a tax case—*Midrex Techs. v. N.C. Dep't of Revenue*, 369 N.C. 250 (2016)—addressing an entirely separate issue for the

proposition that courts sometimes judicially infer a "principal or primary" requirement when interpreting a statute. For the reasons set out below, however, the Court finds *Midrex* to be materially distinguishable.

53. In *Midrex*, our Supreme Court determined the applicability of the single-factor tax allocation formula authorized by N.C.G.S. § 105-140.4(r) to a corporate taxpayer, which hinged on whether the taxpayer was a "building or construction contractor" within the meaning of that statute. The taxpayer, Midrex Technologies, Inc. ("Midrex"), initially "filed North Carolina C Corporation Tax Returns with the Department of Revenue that apportioned its income using the standard three-factor formula provided for in N.C.G.S. § 105-130.4(a)(4) (2016)." *Id*. at 253. Subsequently, Midrex filed amended corporate tax returns that utilized the more advantageous single-factor formula in apportioning its income and sought a refund of $3,303,703 from the Department for allegedly overpaid income taxes. *Id*. Midrex argued that it was eligible for the preferable single-factor formula because it was "engaged in business as a building or construction contractor." *Id*. (citing N.C.G.S. § 105-130.4(a)(4) (2016)).

54. Midrex conceded that it was primarily engaged in the business of selling "Midrex Plants" and "ha[d] only limited involvement in the actual, physical construction of a Midrex Plant." *Id*. at 251, 260. The evidence established that "the client, rather than Midrex ha[d] ultimate responsibility for obtaining the physical construction of a Midrex Plant, with Midrex being responsible for providing scheduling, oversight, and other sorts of technical assistance and advice." *Id*. at 261.

55.     Midrex nevertheless contended that it was entitled to be classified as a building or construction contractor within the meaning of the statute "as long as it was engaged in any non-incidental amount of building or construction work." *Id*. at 263.

56.     In analyzing Midrex's argument, the Supreme Court stated that "the validity of Midrex's claim to be a 'building or construction contractor' depends upon the extent to which the work performed by Midrex's employees involves the act of building or constructing a physical asset, such as a Midrex Plant." *Id*. at 259.

57.     Although there was some evidence that Midrex's employees engaged in construction management and performed a limited amount of hands-on construction activities, the Supreme Court determined that this evidence was insufficient to permit Midrex to be deemed a "building or construction contractor."

> As Midrex notes, construction management activities are included within the NAICS construction classification.  In light of that fact, Midrex argues that it should be deemed a construction company for NAICS-related purposes given that it performs what amounts to construction management services for its clients and that it should be deemed to be a "building or construction contractor" for that reason.  Midrex's argument to this effect fails, however, because an NAICS classification determination is supposed to be premised upon the identification of an entity's primary business activity.  Although the record does contain evidence tending to show that Midrex performs a certain amount of construction management work, the record does not provide any support for an assertion that the provision of such services constitutes Midrex's primary business activity.  For that reason, Midrex could not properly be classified as a construction manager for purposes of the NAICS classification system given that construction management was not its primary line of business during the relevant time period.  As a result, the fact that Midrex performs a certain amount of construction management work does not justify a decision in Midrex's favor in this case.
>
> . . .

In other words, acceptance of Midrex's argument hinges on the proposition that the company is not required to be primarily "engaged in business as a building or construction contractor." Admittedly, as Midrex notes, the word "primarily" does not appear in the relevant statutory language. *See* N.C.G.S. § 105-130.4(a)(4). The absence of the word "primarily" from N.C.G.S. § 105-130.4(a)(4), while relevant, is not, however, dispositive in light of the rule of statutory construction to the effect that the fact "[t]hat a legislature declined to enact a statute with specific language does not indicate the legislature intended the exact opposite." *N.C. Dep't of Corr. v. N.C. Med. Bd.*, 363 N.C. 189, 202, 675 S.E.2d 641, 650 (2009) (citation omitted). Thus, the ultimate issue for our consideration remains what the relevant statutory language, when read in context and in its entirety, should be understood to mean.

. . .

Acceptance of the construction of the relevant statutory language contended for by Midrex would have the effect of allowing any corporation that performed some building or construction work to take advantage of the single-factor formula made available by N.C.G.S. § 105-130.4(r), despite the fact that the General Assembly clearly intended that the single-factor formula was only to be made available to a limited class of corporate taxpayers, with the remaining corporate taxpayers being required to use the three-factor formula. Any decision that would have the effect of vastly expanding the number of entities entitled to use the single-factor test would appear to conflict with the apparent legislative intent.

. . .

Thus, for the reasons set forth above, we conclude that the administrative law judge and the trial court properly determined that Midrex was not a "building or construction contractor" for purposes of N.C.G.S. § 105-130.4(a)(4).

*Id.* at 261–264.

58. This Court does not find *Midrex* to be suggestive of an intent by our Supreme Court to judicially impose a "primary or principal use" requirement across the board in every tax statute providing special treatment for a taxpayer who is engaged in certain activity. To the contrary, *Midrex* suggests the employment of a

case-by-case approach.[10]  Based on the facts in *Midrex*, it was logical for the Supreme Court to impose such a requirement in that case.  After all, it would make little sense to allow an entity that only rarely engaged in the work of contracting to take advantage of a taxation formula applicable only to building or construction contractors.

59.　　Here, conversely, FSC "manufactured" extremely large quantities of HMA throughout the relevant period.  Indeed, the record discloses that FSC produced 450,907 tons in 2012, 513,064 tons in 2013, and 704,996 tons in 2014.  (R., at RP_0006.)  It did so by utilizing the process that our Supreme Court has repeatedly described as manufacturing—i.e., "the producing of a new article or use or ornament by the application of skill and labor to the raw materials of which it is composed." *Duke Power*, 274 N.C. at 513.  In short, there is simply no valid comparison between the extent of FSC's manufacturing of HMA and the extent of Midrex's actual work (or lack thereof) as a building or construction contractor.

60.　　In reaching its conclusion that FSC is entitled to the Mill Machinery Exemption, the Court need not—and does not—address FSC's argument that nothing in section 105-187.51(a)(1) requires it to have sold *any* portion of the HMA it created to third parties as long as it used 100% of its HMA in fulfilling its construction contracts (or for some other business-related purpose).  It is true, as FSC asserts, that *Clayton-Marcus* does not overtly state a requirement that some designated portion of

---

[10] As FSC states in its brief, "*Midrex* dealt with a statute entirely unrelated to N.C.G.S. § 105-187.51, with different public policy implications and legislative goals." (Resp't's Br. Opp., at 20.)

the created product at issue must have been sold to third parties in order for a manufacturing exemption to apply. But even if—as *Oscar Miller* suggests—that proposition is, in fact, implicit in the Supreme Court's reasoning in *Clayton-Marcus*, any such requirement has been satisfied here. It is undisputed that during the relevant period, FSC sold to third parties *over 300,000 tons* of HMA—a quantity that even the Department's counsel conceded at the 14 December hearing was "not insignificant."

61.     The Department has failed to adequately explain why a ruling in favor of FSC on these facts would constitute an absurd result or—to use the language of *Clayton-Marcus*—"press the word 'manufactured' to its dryly logical extreme in disregard of the obvious purpose of the Sales and Use Tax Act[.]" *Clayton-Marcus*, 286 N.C. at 224.

62.     Finally, the Department attempts to argue that various provisions of the North Carolina Administrative Code along with certain Technical Bulletins promulgated by the Department compel a ruling in the Department's favor in this case.[11]

63.     However, the Court has carefully reviewed each of these provisions and finds that they do not impact its analysis or resolution of this issue. As the Department conceded at the 14 December hearing, not a single one of these provisions addresses the key issue presented here—that is, whether an entity such as FSC who uses portions of the product it manufactures from the TPP it has purchased to fulfill

---

[11] These provisions include 17 NCAC 07B.2602; 17 NCAC 07B.2603; and *N.C. Sales and Use Tax Technical Bulletins* 31-1 and 31-4.

its own contracts and sells the remainder to third parties is entitled to the Mill Machinery Exemption under section 105-187.51(a)(1).

## CONCLUSION

64. For the reasons set out above, the Court hereby **AFFIRMS** the Final Decision.

**SO ORDERED**, this 30th day of January, 2023.

/s/ Mark A. Davis
Mark A. Davis
Special Superior Court Judge
for Complex Business Cases